FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS
JUL 22 2026
TAMMY H. DOWNS, CLERK
By: DEP CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
DELTA DIVISION

**STATE OF ARKANSAS, *ex rel.***
**TIM GRIFFIN, ATTORNEY GENERAL** **PLAINTIFF**

**v.** **No. 2:26CV113-BSM**

**SNAP INC.** **DEFENDANT**

This case assigned to District Judge Miller
and to Magistrate Judge Volpe

**DEFENDANT SNAP INC.'S NOTICE OF REMOVAL**

Defendant Snap Inc. ("Snap") respectfully gives notice of the removal of the above-captioned action from the Circuit Court of Phillips County, Arkansas, to the United States District Court for the Eastern District of Arkansas, Delta Division, pursuant to 28 U.S.C. §§ 1367, 1442, and 1446. Removal is warranted under 28 U.S.C. § 1442(a)(1), which permits removal by "any person acting under [any] officer[] of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office." In support, Snap provides this short and plain statement of the grounds that entitle it to removal, as required under 28 U.S.C. § 1446(a).[1]

## I. Factual Background

1. On June 23, 2026, the State of Arkansas, by and through the Attorney General of Arkansas ("Plaintiff"), filed its Complaint ("Compl.") in the Circuit Court of Phillips County, Arkansas, Case No. 54CV-26-251.

2. Snap was formally served with the Complaint on June 23, 2026.

[1] In filing this Notice, Snap does not waive any right, defense, affirmative defense, or objection, including any challenges to venue and/or the exercise of personal jurisdiction.

3. Plaintiff brings a claim under the Arkansas Public Nuisance Law, a claim under the Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-101, *et seq.* (the "ADTPA"), and a claim for unjust enrichment.

4. Count I of the Complaint alleges that Snap violated public nuisance law by designing, marketing, and operating Snapchat and targeting Arkansas youth in a way that allegedly interferes with the functions and operations of the State and impacts the public health, safety, and welfare of the public in Arkansas. Compl. ¶ 224.

5. Count II of the Complaint alleges that Snap engaged in deceptive practices in violation of the ADTPA by allegedly making false representations as to the safety and purported addictiveness of Snap's services and platforms. Compl. ¶ 247.

6. Count III of the Complaint alleges that Snap committed unjust enrichment by allegedly designing its social media platform to be addictive in nature, thereby monetizing the screen time of Arkansas's citizens and causing harm, which conferred a financial benefit on Snap without receiving an expected benefit. Compl. ¶ 259.

7. Plaintiff's claims threaten to interfere with Snap's ability to carry out its responsibilities "acting under" federal officers, including officers from the U.S. Department of Homeland Security ("DHS") and the U.S. Food and Drug Administration ("FDA"). Those agencies work with Snap to ensure that important public service messages reach 13- to 17-year-olds on Snapchat.

8. Plaintiff's claims seek to penalize Snap for conduct related to its work assisting the federal government in accomplishing its goals of specifically reaching teenage audiences, and Plaintiff's requested injunctive relief would necessarily impair Snap's ability to facilitate the federal government's messaging to those target audiences.

9. Snapchat is an important platform for federal agencies to utilize when carrying out their duties to engage with teen audiences and disseminate critical health, safety, and well-being messaging. Snapchat has a broad reach among teenagers, and it permits teenagers starting at age 13 to sign up for its services. Federal agencies seeking to reach teenagers on important issues of health, safety, and well-being engage with Snap to use its platform in order to reach a substantial share of their targeted audience.

**A. Department of Homeland Security Know2Protect and Pledge2Protect Campaigns**

10. Snap assists DHS as part of the Know2Protect and Pledge2Protect campaigns, with Know2Protect being the first-of-its-kind federal campaign dedicated to educating teenagers and adults about online safety risks and specifically preventing online sexual exploitation and abuse. Pledge2Protect is the official call-to-action for Know2Protect, which encourages people, including minors, to take action and educate themselves concerning online child exploitation and preventative measures.

11. DHS carries out these campaigns in furtherance of its statutory responsibilities to prevent child exploitation under 6 U.S.C. § 473. DHS's public communications about the Know2Protect campaign explain that the agency engaged Snap specifically because of its ability to "spread awareness to one of the campaign's key audiences: teens" and to engage teens "directly" on a platform that "resonates strongly with teens." DHS, *DHS Know2Protect and Snap Inc. Launch Innovative Virtual Resource to Educate Teens About Online Harms* (Oct. 1, 2024) ("DHS Press Release").[2] DHS also publishes a "social media toolkit," which explains how people, including minors, can use online platforms like Snapchat to inspire each other to take the Pledge2Protect and share it with others "far and wide" to create "a ripple effect of awareness,

---

[2] Available at https://perma.cc/6LEW-277X.

action and change" and "a wave of safety in the digital world." DHS, *Know2Protect Social Media Toolkit* (last updated July 9, 2026).[3]

12. Since 2024, Snap has entered into Memoranda of Understanding ("MOUs") with the Child Exploitation Investigations Unit of DHS's Cyber Crimes Center. These MOUs set the framework for Snap's efforts in assisting DHS with the development, scaling, and promotion of the Know2Protect and Pledge2Protect campaigns.

13. Snap has assisted DHS with the Know2Protect and Pledge2Protect campaigns by conducting research on young adults' awareness of and familiarity with various risks of child sexual exploitation and abuse online, including research focused on teens aged 13 to 17. This research helps inform the development and operation of the federal government's campaign.

14. DHS furthers its goals by "leveraging Snapchat's interactive features." DHS Press Release. For example, pursuant to the MOUs, Snap assisted DHS with building two custom "Lenses" (one for each campaign), which are features unique to Snapchat that allow users to add interactive animations to photos and videos.

15. The Know2Protect Lens "is designed to engage teens through a fun and interactive quiz" that asks questions about online safety and how to prevent online harm. *Id.* The Know2Protect Lens makes this educational process "an entertaining adventure": users can create videos of themselves taking the quiz; use Snapchat's other interactive features to add effects, animations, and personalization to their video; and then share their video with friends and family. *Id.* Through the Know2Protect Lens, DHS explains that it can "bring important online safety information to [the teen] community directly." *Id.*

---

[3] Available at https://perma.cc/JV4Y-PNGL.

16. The Pledge2Protect Lens dresses users' personalized avatars (known as "Bitmojis") in a custom t-shirt that reads "Take the Pledge2Protect" and includes the Pledge2Protect campaign logo and the web address for the Know2Protect website. Users who take the pledge are encouraged to use the Lens to share their dressed Bitmoji with friends or family. A QR code specific to the Snapchat platform, which brings users directly to the Lens, is displayed on the Know2Protect website.[4]

17. Snap assists both DHS and its advertising contractor to ensure the Know2Protect and Pledge2Protect projects operate according to DHS's objectives. Snap connected DHS and its contractor to a longtime production partner to build the Know2Protect and Pledge2Protect Lenses for the platform. DHS's contractor coordinated directly with the production partner on Lens development, revisions, and feedback cycles, while Snap and DHS met intermittently to discuss the campaigns. DHS approved the final content of the Know2Protect Lens, which launched in October 2024. The Pledge2Protect Lens launched in August 2025.

18. Following the success of the Know2Protect Lens in reaching and engaging the targeted teen audience, DHS entered into another MOU with Snap, which ran through December 2025 and included the Pledge2Protect effort.

19. Additionally, DHS utilizes in-app advertisements to promote Know2Protect using advertising credits provided by Snap. DHS has used many of those credits to target teens aged 13 to 17. DHS uses those credits to amplify the reach of the campaigns, including to promote the Know2Protect and Pledge2Protect Lenses and to connect users to campaign "call to action" video advertisements that DHS produced. DHS dictates the "placement" of the Know2Protect and Pledge2Protect advertisements by selecting where and how the advertisements are displayed on

---

[4] Available at https://perma.cc/H9KZ-N892.

the Snapchat application. Snap implements DHS's request to target campaigns to teen users aged 13 to 17, resulting in a high number of "impressions" (user views) among that target audience.

**B. Department of Homeland Security Blue Campaign**

20. Snap also facilitates the promotion of DHS's Blue Campaign, a national public awareness campaign located within the DHS Center for Countering Human Trafficking that is aimed at educating the public about the indicators of human trafficking and how to combat it. DHS carries out this campaign in furtherance of its human trafficking prevention responsibilities under 6 U.S.C. §§ 242 and 242a. As part of the Blue Campaign, DHS publishes materials designed to help "reach those considered vulnerable to exploitation and human trafficking: youth." Blue Campaign, <u>How To Talk to Youth About Human Trafficking</u> 1 (June 5, 2025).[5]

21. In 2024 and 2025, DHS utilized in-app advertisements to promote the Blue Campaign. DHS uses Snapchat to amplify the reach of the Blue Campaign, including by connecting users to Blue Campaign advertisements produced by DHS. DHS dictates the "placement" of the Blue Campaign advertisements by selecting where and how the advertisements are displayed on the Snapchat application. Snap also implements DHS's request to target young users, including those aged 13 to 17, resulting in a high number of impressions among that target audience. Most recently, Snap implemented the Blue Campaign's 2025 back-to-school initiative to increase awareness around human trafficking, including by targeting teen users aged 13 to 17.

**C. Food and Drug Administration Public Health Campaigns**

22. Snap has worked with the FDA for years to implement the Center for Tobacco Products' public health campaigns, many of which target teen audiences aged 13 to 17. The FDA's Center for Tobacco Products utilizes Snap to fulfill its statutory duties to reach teen users with

---

[5] Available at https://perma.cc/W2PL-LEFK.

important messages about the risks of vaping and cigarette use. 21 U.S.C. §§ 387a(e), 393(d)(2)(D).

23. These Center for Tobacco Products public health campaigns include "The Real Cost" and "Next Legends." The Real Cost campaign seeks to reach U.S. teenagers, including teenagers under the age of 18, with public health messages about the risks of tobacco and nicotine use. The FDA specifically engages platforms like Snapchat because it recognizes that frequent engagement with youth through the internet "helps broaden the campaign's reach and creates spaces for teens to engage in peer-to-peer conversations about tobacco use in ways that are authentic to who they are." The Center for Tobacco Products, The Real Cost: Campaign Overview 2 (Jan. 2018).[6] The Next Legends campaign was designed to educate American Indian/Alaska Native teenagers, including those under the age of 18, about the harms of vaping.

24. Snap assisted the FDA with building multiple custom The Real Cost and Next Legends Lenses, which, like the Know2Protect and Pledge2Protect Lenses, are features unique to Snapchat. These interactive Lenses have animations which provide facts about the dangers of cigarette and vape use when users engage with the Lens. Users can create a video of themselves using the Lenses, use Snapchat's other interactive features to add effects, animations, and personalization to their video, and then share their video with friends and family.

25. The FDA has also utilized in-app advertisements to promote initiatives like The Real Cost and Next Legends. Snap assists the FDA with amplifying the reach of its public health campaigns to teenage audiences, including by connecting users to in-app advertisements produced by the FDA. The FDA dictates the "placement" of these advertisements by selecting where and

[6] Available at https://perma.cc/7UE8-4P4U.

how the advertisements are displayed on the Snapchat application. Snap also implements the FDA's request to target in-app advertisements to teen users aged 13 to 17.

26. The FDA contracts with a media agency to coordinate its public outreach campaigns on Snapchat. The media agency operates the FDA's account on Snap's advertiser platform and has agreed to the self-serve advertiser platform contract on behalf of the FDA. The FDA, through its media agents, sends detailed campaign briefs to Snap that outline the agency's campaign goals and objectives. During active FDA campaigns, Snap meets with the FDA's media agency to ensure the campaign performs according to these goals and objectives. These meetings also serve as an opportunity for the FDA to give Snap feedback on how to better meet the FDA's directives in reaching its campaign goals.

## II. Removal Standard

27. "A civil action . . . that is commenced in a State court . . . may be removed by [a defendant] to the district court of the United States for the district and division embracing the place wherein it is pending" when it is "against or directed to" "any person acting under [an] officer[] of the United States or of any agency thereof . . . for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1).

28. A removing defendant must, within thirty days of service of the initial pleading, file a notice of removal "containing a short and plain statement of the grounds for removal, together with a copy of all process, pleadings, and orders served upon such defendant or defendants in such action." 28 U.S.C. § 1446(a)–(b).

## III. Venue

29. Removal to this Court is proper under 28 U.S.C. §§ 1442(a) and 1446(a) because this Court is the United States District Court for the district in which the state court action is pending. *See* 28 U.S.C. § 83.

## IV. Bases for Removal

### A. This Court Has Jurisdiction Over Plaintiff's Claims Under the Federal Officer Removal Statute

30. Under the federal officer removal statute, a private defendant may remove a case under § 1442(a)(1) if four elements are met. *Minnesota by Ellison v. Am. Petroleum Inst.*, 63 F.4th 703, 714 (8th Cir. 2023). The federal officer removal statute is unlike other removal statutes and must be "liberally construed." *Buljic v. Tyson Foods, Inc.*, 22 F.4th 730, 738 (8th Cir. 2021); *Jacks v. Meridian Res. Co., LLC*, 701 F.3d 1224, 1230 (8th Cir. 2012), *abrogated on other grounds by BP P.L.C. v. Mayor & City Council of Balt.*, 593 U.S. 230 (2021).

31. ***First***, the defendant must show that it "acted under the direction of a federal law enforcement officer." *Buljic*, 22 F.4th at 738. This prong is also referred to as the "acted under" requirement. *See Jacks*, 701 F.3d at 1230. The Supreme Court instructs courts to "liberally construe[]" the "broad" phrase "acting under." *Watson v. Philip Morris Co., Inc.*, 551 U.S. 142, 147 (2007) (internal quotation marks and citation omitted). Defendants satisfy this requirement where their "effort[s were] to *assist*, or to help *carry out*, the duties or tasks of the federal superior." *Id.* at 152 (emphasis in original). This relationship "typically involves subjection, guidance, or control." *Buljic*, 22 F.4th at 738 (citing *Watson*, 551 U.S. at 151). In contrast, "simply *complying* with the law," even where a business is subject to a detailed regulatory scheme, does not satisfy the first prong under § 1442(a)(1). *Watson*, 551 U.S. at 152 (emphasis in original).

32. ***Second***, the defendant must show that the challenged conduct "relate[s] to a federal office." *Minnesota by Ellison*, 63 F.4th at 715. This principle is derived from the text of the federal officer removal statute, which was broadened by Congress in 2011 to allow for removal of conduct that "has a 'connection' or 'association' with the federal action." *Id.*; *see also Chevron USA Inc. v. Plaquemines Par.*, 146 S. Ct. 1052, 1060 & n.3 (2026). Notably, "the 'relating to' requirement presents a low bar." *Minnesota by Ellison*, 63 F.4th at 715. As the Supreme Court recently stated in *Plaquemines*, a defendant's actions under a federal officer can be related to challenged conduct even if those actions were not "specifically designed to affect" the challenged conduct. 146 S. Ct. at 1060 (quoting *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 139 (1990)). Thus, "a removing defendant need not show that his federal duties specifically required or strictly caused the challenged conduct." *Id.* It is enough that a suit has "a connection that is not tenuous, remote, or peripheral" to the defendant's federal duties. *Id.* at 1061 (internal quotation marks and citation omitted).

33. ***Third***, the removing defendant must be a "person" under the removal statute. *Minnesota by Ellison*, 63 F.4th at 714. It is uncontroversial that "the 'person' contemplated by the federal officer removal statute includes corporations." *Jacks*, 701 F.3d at 1230 n.3.

34. ***Fourth***, the defendant must assert a colorable federal defense. *Jacks*, 701 F.3d at 1230 n.3. It is the "raising of a federal question" in the defendant's "removal petition that constitutes the federal law" that "support[s] Art[icle] III 'arising under' jurisdiction." *Mesa v. California*, 489 U.S. 121, 136 (1989). Thus, even where there is a "nonfederal cast [to] the complaint[,] the federal-question element is met if the defense depends on federal law." *Jefferson Cnty. v. Acker*, 527 U.S. 423, 431 (1999). The Supreme Court has explicitly "rejected a narrow, grudging interpretation" of the colorable federal defense requirement. *Id.* (internal quotation

marks and citation omitted). Rather, a colorable federal defense need only be plausible; a defendant need not have a "sustainable defense" or to "win his case before he can have it removed." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969); *Jacks*, 701 F.3d at 1235. A federal defense is colorable so long as it is not "immaterial and made solely for the purpose of obtaining jurisdiction" or "wholly insubstantial and frivolous." *Fernandez v. Tyson Foods, Inc.*, 509 F. Supp. 3d 1064, 1081 (N.D. Iowa 2020), *aff'd by Buljic*, 22 F.4th 730 (quoting *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 297 (5th Cir. 2020)). "One of the primary purposes of the removal statute—as its history clearly demonstrates—*was to have such defenses litigated in the federal courts*." *Jacks*, 701 F.3d at 1235 (quoting *Bennett v. MIS Corp.*, 607 F.3d 1076, 1085 (6th Cir. 2010)) (emphasis in original).

35. Plaintiff's claims under the ADTPA and Arkansas common law are removable based on Snap's work assisting federal agencies to meet their statutory duties by delivering their public messaging to Snapchat users aged 13 through 17, most notably under DHS's Know2Protect and Pledge2Protect programs, DHS's Blue Campaign, and the FDA's public health campaigns.

**1. Snap Implements the Campaigns Under the Direction of Federal Agencies**

36. ***First***, Snap is "acting under" DHS, a federal agency, in the Know2Protect and Pledge2Protect campaigns. DHS is statutorily required to conduct "outreach and training activities" concerning child exploitation in "collaborat[ion] with other governmental, nongovernmental, and nonprofit entities approved by the Secretary." 6 U.S.C. § 473(b)(2)(F). Through the Know2Protect and Pledge2Protect campaigns, Snap is acting "to *assist*, or to help *carry out*," these statutorily mandated duties and tasks of DHS and its officers, "the federal superior." *Watson*, 551 U.S. at 152 (emphasis in original). Snap therefore assists DHS with services DHS would be statutorily required to provide itself in the absence of a private contract. *See Griffin v. Optum, Inc.*, 175 F.4th 897, 902 (8th Cir. 2026) (citing *Buljic*, 22 F.4th at 739).

37. When Snap acted under its agreement with DHS to perform services and make products for the government, Snap did so with the "guidance" of DHS. *See id.* at 903. DHS signed MOUs with Snap in 2024 and 2025 to guide Snap's work on the Know2Protect and Pledge2Protect campaigns. DHS controlled the content of the Know2Protect and Pledge2Protect lenses, met with Snap repeatedly during the Lens development processes, and exercised final approval over the Know2Protect and Pledge2Protect Lenses before launch. DHS determines how to target its advertising and promotion on Snapchat, including by selecting where on the platform its advertisements are displayed to users, and DHS has chosen to target much of its advertising with respect to the Know2Protect and Pledge2Protect programs at users aged 13 to 17.

38. ***Second***, Snap is "acting under" DHS by assisting DHS and its officers with advertising its Blue Campaign content to the agency's chosen audience, including users aged 13 to 17. DHS is statutorily required to "operate the Blue Campaign's nationwide public awareness effort and any other awareness efforts needed to . . . prevent human trafficking" and "coordinate external engagement . . . regarding human trafficking with critical partners, including . . . corporations." 6 U.S.C. § 242a(c)(4)–(5); *see also* 6 U.S.C. § 242(e)(7) (requiring the Blue Campaign to "provide guidance and training" to DHS concerning "leveraging partnerships with . . . private sector organizations to raise public awareness of human trafficking"). When Snap works with DHS's Blue Campaign, it is acting "to *assist*, or to help *carry out*," these statutorily mandated duties and tasks of DHS, a federal superior. *Watson*, 551 U.S. at 152 (emphasis in original). Snap therefore assists DHS with efforts that DHS would be statutorily required to perform absent Snap's involvement.

39. Snap's acts for the Blue Campaign were under the "guidance" of DHS and its officers. *Griffin*, 175 F.4th at 903. DHS determines how to target its advertising and promotions

on Snapchat, including by selecting where on the platform its advertisements are displayed to users. DHS also chooses to target campaigns on Snapchat to young users, including those aged 13 to 17, and exercises control over the contents of the Blue Campaign's advertisements.

40. ***Third***, Snap is "acting under" the FDA's federal authority by assisting the FDA and its officers with advertising the FDA's anti-smoking and vaping campaigns to the agency's chosen audience of teen users, including users aged 13 to 17. The FDA is statutorily required to "conduct[] educational and public information programs relating to [its] responsibilities," 21 U.S.C. § 393(d)(2)(D), which include implementing the 2009 Family Smoking Prevention and Tobacco Control Act, 21 U.S.C. § 387a(e). A key objective of that Act is "reducing the use of tobacco by minors" to reduce premature deaths. Family Smoking Prevention and Tobacco Control Act, Pub. L. No. 111-31, § 2(14), 123 Stat. 1776, 1777 (2009). Thus, when Snap works with the FDA on its anti-tobacco public health campaigns targeting teens, Snap is acting "to *assist*, or to help *carry out*" these statutorily mandated duties and tasks of the FDA, as the federal superior. *Watson*, 551 U.S. at 152 (emphasis in original). In other words, Snap assists the FDA with services that the FDA would be statutorily required to perform itself in the absence of a private contract. *Griffin*, 175 F.4th at 902.

41. As with its work with DHS, Snap's assistance with the Center for Tobacco Product's public health campaigns were under the "guidance" of the FDA. *Id.* The FDA provides Snap with detailed campaign briefs to guide Snap's work and determines how to target its advertising and promotions on Snapchat, including by selecting where on the platform its advertisements are displayed to users. The FDA has chosen to target some of its campaigns on Snapchat exclusively to users aged 13 to 17, and the FDA exercises control over the contents of

its campaigns and its interactive Lenses. Additionally, Snap's frequent meetings with the FDA's media agency during active campaigns ensure that the campaign is guided by the FDA's feedback.

**2. Plaintiff's Claims Are Connected to Government-Directed Conduct**

42. Plaintiff's claims relate to, and have a clear connection and association with, Snap's implementation of these federal programs.

43. ***First***, each of Plaintiff's claims targets allegedly addictive features that Snap uses in carrying out DHS and FDA directives. Compl. ¶¶ 212, 219, 242, 259, 260; *see also* Compl. ¶ 4–5. The allegedly addictive features include algorithms used to recommend and deliver content to users, Compl. ¶ 211, such as through Snap's "Stories," "Spotlight," and "Discover" features, Compl. ¶¶ 91–99.

44. Snap relies on these features to assist DHS and the FDA in implementing their programs, including to ensure that the federal agencies' programs reach their target audience, which includes teens under 18, and to maximize user impressions for these programs. In some instances, the agencies affirmatively selected to have their advertisements displayed through these features. Thus, if Snap had "refrained from" using the features that the Plaintiff seeks to omit from Snap's design, then its work pursuant to federal contracts "may have suffered." *Plaquemines*, 146 S. Ct. at 1060.

45. ***Second***, Plaintiff's claims relate to the work that Snap conducts in assisting DHS and the FDA because they seek to hold Snap liable for not taking actions that would interfere with minor teens' access to Snapchat, where Snapchat delivers the agencies' messaging. *See* Compl. ¶ 166 (faulting Snap for "failing to implement adequate age restrictions and other parental controls"); *see also id.* ¶ 259. This interference is underscored by the fact that the agencies rely on the platform's large teen user base and its ability to reach a broad population of American teens,

including Arkansas residents. Specifically, requiring parent consent for all minor Arkansas users in order for them to use Snapchat would necessarily limit their access to the platform and the federal government's public safety and health messaging. Similarly, the injunctive relief that Plaintiff seeks would make it more difficult for Arkansas teens to access the Snapchat platform (either at all or to the full extent), and to receive the federal government's public safety and health messaging. *See* Compl. ¶¶ 61–62. This directly interferes with Snap's efforts in assisting DHS and the FDA in carrying out their statutory duties and reaching their targeted teen audiences. If Snap took action that reduced the number of minor teens who download and use Snapchat, Snap's work for DHS and the FDA "may have suffered." *Plaquemines*, 146 S. Ct. at 1061.

46. ***Third***, the Complaint alleges that Snap violates Arkansas law in part because it "promotes or amplifies harmful content." Compl. ¶ 214; *see also id.* ¶ 259. Highlighting the grave First Amendment concerns raised by the Complaint, this broad (and poorly-defined) category of content could easily be understood to reach the content of the DHS and FDA programs implemented by Snap. For instance, the Complaint alleges that Snap "fail[ed] to warn and affirmatively misle[d] parents and children about the sex trafficking [and] sexual exploitation content" on Snapchat, Compl. ¶ 24; *see also id.* ¶ 94 (alleging that Snapchat encourages users to continually view "depressing and worrisome" content). This broadly defined category of content could encompass the Know2Protect, Pledge2Protect, and Blue Campaign initiatives, including the Know2Protect and Pledge2Protect Lenses, which are interactive features that include content related to the sexual abuse and exploitation of minors.

### 3. Snap's Anticipated and Well-Founded Federal Defenses Are Certainly Colorable

47. Snap plans to raise multiple federal defenses to Plaintiff's claims that are plainly colorable, including defenses under the First Amendment of the U.S. Constitution and Section 230 of the Communications Decency Act (the "CDA").[7]

48. ***First***, the First Amendment bars Plaintiff's claims, including because they seek to compel Snap to disclose "highly subjective opinions about content-related harms to children." *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1122 (9th Cir. 2024). For example, Plaintiff seeks to impose liability based on Snap's "misrepresentations through its statements and omissions that its platform is safe for youth." Compl. ¶ 215. Plaintiff also seeks to hold Snap liable for failure to disclose that Snapchat (allegedly) is addictive and contributes to compulsive or excessive use by minors and mental health problems. *See* Compl. ¶¶ 70, 248, 253. What is "addictive" or "safe," and ultimately, what content is appropriate for children of different ages, are all highly subjective inquiries. *See Courtright v. Epic Games, Inc.*, 795 F. Supp. 3d 1156, 1167 (W.D. Mo. 2025) (holding that what is "addictive" "is a very broad category" and that "requiring [defendants] to remove these allegedly addictive features would force them to change the content of the games to make them less enticing or enjoyable for users" in violation of the First Amendment). Laws that attempt to "deputize private actors into determining whether material is suitable for kids" contravene the First Amendment. *Bonta*, 113 F.4th at 1118; *see Courtright*, 795 F. Supp. 3d at 1167. And "imposing liability on a platform any time the protected speech by or on that platform results in a specified 'harm' to a single Arkansas viewer that the platform should have anticipated

---

[7] Snap identifies these defenses as examples for jurisdictional purposes and reserves all rights to raise other defenses in this litigation.

[] impermissibly limits the online posting and promotion of protected speech that is not harmful to most viewers." *NetChoice v. Griffin*, 812 F. Supp. 3d 905, 922 (W.D. Ark. 2025).

49. Further, the allegations supporting Plaintiff's claims target certain features that can incorporate Snap's own speech, including notifications, rewards, charms, and lenses. *See* Compl. ¶¶ 4, 24, 76–90. These aspects of Plaintiff's claims are barred by the First Amendment because they seek to punish Snap for the content of its own speech. *See Moody v. NetChoice, LLC*, 603 U.S. 707, 716–17 (2024) (the First Amendment protects internet platforms that "produce their own distinctive compilations of expression" including by "mak[ing] choices about what third-party speech to display and how to display it"); *id.* at 719 ("[T]he First Amendment . . . does not go on leave when social media are involved."); *NetChoice v. Griffin*, 812 F. Supp. 3d at 925 ("Prohibiting this social feedback because it causes addiction in some users burdens the speech of the many other users for whom this feedback is not addictive."); *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 702 F. Supp. 3d 809, 837 (N.D. Cal. 2023); *Angelilli v. Activision Blizzard, Inc.*, 781 F. Supp. 3d 691, 700–03 (N.D. Ill. 2025).

50. Moreover, because Plaintiff's claims seek to impose liability upon Snap for not sufficiently restricting youths on its platform, Compl. ¶ 166 ("By failing to implement adequate age restrictions and other parental controls that give parents true control over their children's activity, Snap allows harmful interactions with predators to continue unnoticed."), those claims are barred by the First Amendment. *See NetChoice, LLC v. Griffin*, 2025 WL 978607, at *8 (W.D. Ark. Mar. 31, 2025) (Age restrictions "burden[] social media access for all Arkansans—both adults and minors whose parents would allow them to use social media" in violation of the First Amendment).

51. ***Second***, the Complaint specifically challenges Snap's activities as a publisher of third-party content in violation of Section 230 of the CDA. Section 230 of the CDA provides that "[n]o provider . . . of an interactive computer service shall be treated as the publisher or speaker" of content provided by a third party. 47 U.S.C. § 230(c)(1). Section 230 thus "bar[s] plaintiffs from holding [online platforms] legally responsible for information that third parties created and developed." *Johnson v. Arden*, 614 F.3d 785, 791 (8th Cir. 2010). The State's claims fall within the CDA's grant of immunity because they seek to hold Snap liable for features that make available "information that third parties created and developed." *Id.*; Compl. ¶ 166 ("Snapchat's algorithm has recommended inappropriate sexual content to adolescent users"); Compl. ¶ 214 (alleging that Snap "promotes or amplifies" the types of content at issue in Plaintiff's claims). The Complaint therefore attacks quintessential publishing activity protected by Section 230. *See, e.g.*, *In re Soc. Media*, 702 F. Supp. 3d at 831–32 ("In essence, the recommendation function challenged is indistinguishable from publishing, it is the means through which defendants publish third-party content to users").

52. Although Plaintiff stylizes its claims as attacking misrepresentations, omissions, and failures to disclose, these claims fundamentally implicate Snap's role as a publisher of third-party content and are barred by Section 230. *See, e.g.*, *Doe v. Grindr Inc.*, 128 F.4th 1148, 1154 (9th Cir. 2024). Not only would liability be premised on "second-guessing" Snap's editorial decisions, but Plaintiff's claims that Snap "fail[ed] to warn and affirmatively misl[ed] parents and children about the sex trafficking, sexual exploitation content, and drug and gun sales on the platform," Compl. ¶ 24, *see also* Compl. ¶¶ 182, 194–204, seek to hold Snap accountable for publishing third-party content. *Grindr*, 128 F.4th at 1154; *NetChoice v. Griffin*, 812 F. Supp. 3d at 929 ("the undisputed core of Section 230 immunity protects a website's moderation decisions,

in its role as a 'publisher,' about which third-party content to remove and which to permit—decisions which also receive First Amendment protection." (internal quotation marks and citation omitted)). The representations and warnings that Plaintiff argues are necessary "would only be necessary because of [Snap]'s allegedly inadequate policing of third parties." *In re Facebook, Inc.*, 625 S.W.3d 80, 93–94 (Tex. 2021); *Herrick v. Grindr, LLC*, 306 F. Supp. 3d 579, 592 (S.D.N.Y. 2018) (a "proposed warning [] about user-generated content . . . goes to Grindr's publishing functions" and therefore triggers Section 230 protection), *aff'd,* 765 F. App'x 586 (2d Cir. 2019).

53. These defenses are at least plausible and satisfy the broad colorable federal defense requirement for federal officer removal. Importantly, at this stage, Snap need not establish a "sustainable defense" or prove that its asserted defenses will ultimately be successful. *Willingham*, 395 U.S. at 407; *Jacks*, 701 F.3d at 1235.

**4. Snap Is Plainly a Person Within the Meaning of the Removal Statute**

54. Snap is a corporate entity that, as described below, assists federal agencies in the performance of their official duties, including the execution of their public safety and health education and outreach initiatives. *Jacks*, 701 F.3d at 1230 n.3. Snap therefore falls squarely within the definition of "person" for purposes of the federal removal statute.

**B. This Court Has Supplemental Jurisdiction Under Sections 1442(a)(1) and 1367**

55. As Snap has explained, this Court has jurisdiction under the federal officer removal statute over Plaintiff's claims. To the extent the Court finds that statute creates original jurisdiction for only some of the claims, the Court still has supplemental jurisdiction over the remaining claims under §§ 1442(a)(1) and 1367.

56. When a defendant removes a § 1442(a)(1) case, courts exercise supplemental jurisdiction over any remaining state law claims against the defendant so as to transfer the entire "civil action." § 1442(a). "Because Section 1442(a)(1) authorizes removal of the entire action even if only one of the controversies it raises involves [acts done under] a federal officer or agency, the section creates a species of statutorily-mandated supplemental subject-matter jurisdiction." 14C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3726 (rev. 4th ed. 2025).

57. This Court can also exercise supplemental jurisdiction under § 1367, because all three counts are "so related . . . that they form part of the same case or controversy." 28 U.S.C. § 1367(a). Claims are so related when "they 'derive from a common nucleus of operative fact.'" *Myers v. Richland Cnty.*, 429 F.3d 740, 746 (8th Cir. 2005) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966)). This standard is satisfied where, like here, the "claims are such that [plaintiff] would ordinarily be expected to try them all in one judicial proceeding." *ABF Freight Sys., Inc. v. Int'l Bhd. of Teamsters*, 645 F.3d 954, 963 (8th Cir. 2011) (quoting *Gibbs*, 383 U.S. at 725). Supplemental jurisdiction should be exercised where, like here, it promotes judicial economy, because it avoids the substantial problem of parallel lawsuits in state and federal court and avoids duplication of work and waste of judicial resources. *Salazar v. Agriprocessors, Inc.*, 527 F. Supp. 2d 873, 887 (N.D. Iowa 2007).

58. Plaintiff's claims all arise from the same factual allegations outlined in paragraphs 1 to 215 of the Complaint. At their core, each of the claims concerns Snap's conduct with respect to providing a platform available to minor teen users and whether Snap is taking sufficient steps to reduce the risks of harm to them. For example, each of Plaintiff's claims alleges that Snap made misrepresentations or omissions to consumers that users "rely upon" when deciding to download—

or that parents rely upon when deciding to allow minors to use—Snapchat because they impact value judgments about whether the platform is appropriate for children. Compl. ¶¶ 36, 215, 246, 250, 252, 253, 260. And all three of Plaintiff's claims are based on the premise that Snapchat is inappropriate for minors because "[i]nstead of adopting meaningful protections, Snap chose design and policy choices that maximize growth while leaving children vulnerable to exploitation." Compl. ¶ 17.

59. Further, the claims, including those focused on the alleged addictiveness of Snapchat and its features, are all interconnected because they rely on allegations about the way content is delivered to Snapchat users. *See, e.g.*, Compl. ¶ 214 (alleging that Snap "promotes or amplifies harmful content" "to youth and adolescent users"); Compl. ¶ 211 (alleging that Snap's "use of algorithms and other design features" "encourage[s] users to spend the maximum amount of time on their platforms despite knowing the harm it causes to its child and adolescent users"). For instance, Plaintiff alleges that the "disappearing content model" (i.e. deletion by default)—what Plaintiff calls "the heart of the platform" Compl. ¶ 57—is "specifically crafted to keep young users compulsively engaged, to the detriment of their mental health and general wellbeing," Compl. ¶ 5, and therefore makes Snap "addictive," an allegation which underlies each of Plaintiff's causes of action, Compl. ¶¶ 219, 248, 259.

## V. Snap Has Complied with All Procedural Requirements for Removal

60. Snap has satisfied the procedural requirements for removal under 28 U.S.C. § 1446.

61. As required by § 1446(a), Snap is filing this Notice of Removal in the United States District Court for the Eastern District of Arkansas. The state court where this action was commenced, the Circuit Court of Phillips County, Arkansas, is within this federal judicial district and division.

62. The Notice of Removal is signed pursuant to Fed. R. Civ. P. 11.

63. Plaintiff served the summons and the Complaint on June 23, 2026, which was less than 30 days ago. Therefore, removal is timely under § 1446(b)(1). *See Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 354 (1999).

64. A copy of "all process, pleadings, and orders served upon such defendant . . . in such action" are attached to this Notice of Removal as Exhibit 1, as required by 28 U.S.C. § 1446(a). These are: Complaint, Summons to Snap Inc., Affidavit of Service, Entry of Appearance of Peter Shults, and Entry of Appearance of Steven Shults.

65. Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being served on Plaintiff's counsel and filed with the state court clerk contemporaneously with the filing of this Notice of Removal.

66. Snap reserves all rights. Nothing herein should be construed as a waiver or relinquishment of any of Snap's rights, defenses, or remedies.

WHEREFORE, Defendant Snap Inc. respectfully gives notice that the above-captioned litigation has been removed from the Circuit Court of Phillips County, Arkansas, to the United States District Court for the Eastern District of Arkansas.

DATED: July 22, 2026

Respectfully Submitted,

Peter Shults (Ark. Bar No. 2019021)
Steven Shults (Ark. Bar No. 78139)
SHULTS LAW FIRM LLP
200 West Capitol Avenue, Suite 1600
Little Rock, AR 72201-3621
(501) 375-2301
pshults@shultslaw.com

sshults@shultslaw.com

*-and-*

Jeannie S. Rhee (*pro hac vice forthcoming*)
L. Rush Atkinson (*pro hac vice forthcoming*)
Kyle Smith (*pro hac vice forthcoming*)
Lyle W. Gruby (*pro hac vice forthcoming*)
DUNN ISAACSON RHEE LLP
401 Ninth Street, NW
Washington, D.C. 20004-2637
Tel: (202) 240-2900
jrhee@dirllp.com
ratkinson@dirllp.com
ksmith@dirllp.com
lgruby@dirllp.com

*Attorneys for Defendant Snap Inc.*

**CERTIFICATE OF SERVICE**

I certify that on July 22, 2026, a copy of the foregoing document was served upon counsel for Plaintiff via U.S. Mail and electronic mail addressed as follows:

Mr. Brian Reddick
Mr. Matthew Swindle
Ms. Heather Zachary
REDDICK LAW, PLLC
One Information Way, Suite 105
Little Rock, AR 72202
brian@reddicklawfirm.com
matthew@reddicklawfirm.com
hzachary@reddicklawfirm.com

Mr. Mark Lanier
Mr. Alex J. Brown
Mr. Zeke DeRose III
THE LANIER LAW FIRM
10940 West Sam Houston Parkway North, Suite 100
Houston, TX 77064
mark.lanier@lanierlawfirm.com
alex.brown@lanierlawfirm.com
zeke.derose@lanierlawfirm.com

Peter Shults

# EXHIBIT 1
# to Notice of Removal

ELECTRONICALLY FILED
Phillips County Circuit Court
Tamekia L. Franklin, Circuit Clerk
2026-Jun-23 08:56:52
54CV-26-251
C01D01 : 63 Pages

**IN THE CIRCUIT COURT OF PHILLIPS COUNTY, ARKANSAS**
**CIVIL DIVISION**

**STATE OF ARKANSAS, *ex rel.***
**TIM GRIFFIN, ATTORNEY GENERAL** **PLAINTIFF**

**v.** **Case No.** 54CV-26-251

**SNAP INC.** **DEFENDANT**

**COMPLAINT**

COMES NOW, the State of Arkansas, by and through its Attorney General Tim Griffin ("the State"), and brings this action in a *parens patriae* capacity, and for its Complaint against the Defendant Snap, Inc. states as follows:

## I. INTRODUCTION

1. Defendant Snap Inc. ("Snap") has spent more than a decade marketing Snapchat as a simple and harmless communication tool for young people, particularly for users as young as 13.

2. Snap assured Arkansas parents that features such as disappearing messages, cosmetic filters, and curated content made Snapchat a family friendly, "safe by design" alternative to other social media platforms free of harms like peer pressure, negative social comparison, compulsive use, anxiety, or depression.

3. Those assurances were false. Rather than designing a platform safe for minors, Snap built one that exploits them and exposes them to a variety of foreseeable harms, including sextortion rings, predatory grooming, violent content, illegal drug marketplaces, unrealistic beauty

standards, and an untested My AI chatbot that delivers dangerous and inappropriate advice to minors. These dangers are amplified by Snapchat's core design features, such as disappearing messages and auto vanishing content, that encourage impulsive sharing and make harmful interactions harder for parents and law enforcement to detect.

4. Snap did not merely tolerate these dangers—it monetized them. Recognizing how intensely adolescents respond to reward cycles, peer validation, and social pressure, Snap engineered features such as Snapstreaks, public engagement metrics, algorithmically curated feeds, and constant push notifications to provoke those impulses and keep minors constantly checking the app.

5. Snap has knowingly deployed design features that mimic slot machine mechanics, induce dopamine feedback loops, and leverage peer pressure and social validation metrics. Features such as Snapstreaks, disappearing messages, beautifying filters, ephemeral content, Snap Map, Quick Add, and algorithmic feeds are specifically crafted to keep young users compulsively engaged, to the detriment of their mental health and general wellbeing.

6. Snapchat engineering managers have even boasted that Snapchat should have more addicting features because of how effective they are at boosting usage.

7. These design choices were calculated to leverage the developmental vulnerabilities of minors—the craving for social approval, the sensitivity to exclusion, and the impulse-driven reward systems of the adolescent brain—to drive engagement, refine data collection, and increase advertising revenue. By deliberately exploiting adolescent neurodevelopment in its product design, Snap ensured that minors would become "hooked" on Snapchat and spend hours on the app each day. And every additional minute a child spent on Snapchat translated directly into more data for Snap to harvest and more advertising revenue for Snap to collect.

8. In fact, Snap is among the worst and most egregious offenders of all social media companies. Contrary to popular belief, Snapchat is not a neutral communication tool; it is a digital drug dealer that targets our children. Snapchat is an addictive product, deliberately engineered to manipulate attention and psychological behavior, particularly in teens and preteens. Behind this devastating reality lies a deliberate and calculated business model: Snap has engineered its platform to create addiction in our children to maximize profits over people regardless of the impact on our communities and families.

9. Snapchat has evolved into a platform built to capture attention, deepen dependency, and keep minors online for as long—and as often—as possible. And it works, especially on Arkansas children. In every relevant metric—Snaps seen, Snaps sent, time spent on the app, and more—Arkansas youth surpass the national average.

10. As a direct result, Snapchat shapes how children communicate, how they relate to peers, and how they see themselves, all while exposing them to serious, predictable, and entirely avoidable risks.

11. That compulsive use also translated directly into concrete psychological harms. Snapchat has contributed to rising rates of anxiety, depression, eating disorders, sleep disruption, self harm, and suicidal ideation among minors. Suicide now takes the lives of four times more Arkansas youth than alcohol-related car accidents. Teen suicide in Arkansas is higher than the national average and continues to climb across all counties.

12. Snap's rollout of its "My AI" chatbot heightened the dangers facing young users. Marketed as a friendly, built-in companion, My AI was pushed out to millions of minors—including thousands in Arkansas—even after Snap was warned internally that the tool was under-tested, prone to hallucinations, capable of generating harmful or inappropriate responses, and likely to mislead children into believing it was a trustworthy, human-like confidant. Snap then

misled the public by insisting My AI was safe and age-appropriate—statements directly contradicted by Snap's own internal knowledge. The company launched the product anyway because it served its business goals: increasing engagement, extracting more data, and embedding AI deeper into Snapchat's system. The safety of children was treated as an afterthought.

13. Snapchat also functions as a conduit for exploitation and criminal activity targeting minors. Because of the app's disappearing content and secrecy-driven design, predators, traffickers, drug dealers, extortionists, and other offenders have repeatedly used Snapchat to contact, groom, monitor, and coerce children. These dangers are not abstract or theoretical. Arkansas law enforcement, parents, and educators consistently identify Snapchat as a primary tool used by adults seeking to exploit minors. Rather than correct these issues, Snapchat made continued design choices that impeded meaningful parental oversight and law-enforcement detection.

14. Snap's lax oversight has resulted in devastating effects on Arkansas children. For example, a recent report by the Arkansas Internet Crimes Against Children Task Force identified a significant uptick in sextortion crimes, where a perpetrator targets a child or adolescent to gain illicit photographs of the minor and then extort the minor or his or her parents for money. According to the Task Force, Snapchat is one of the primary platforms used for sextortion.

15. In 2024, allegations arose that a Johnson County Chief Deputy used Snapchat to "groom" an Arkansas female child by sending "inappropriate Snapchats" to her. The child was one of at least two children targeted by the officer.

16. In 2023, a child predator used Snapchat to track a minor child in Texarkana, Arkansas and entice her to provide sexually explicit content in exchange for a vape left in her mailbox. The man was sentenced to 30 years in prison.

17. Snap compounded these dangers by failing to implement even basic safeguards to keep underage users off its platform. Snapchat's age-verification system relies entirely on self-reported birthdays—an approach Snap knows is ineffective and easily manipulated. Children denied access for being under thirteen can simply re-enter a different birthdate and immediately obtain a full, unrestricted account. Snap allows users to change their ages after account creation and permits multiple accounts to be created with the same email address or phone number, making it trivial for minors to evade restrictions and for adults to disguise themselves as children. These failures are not accidental. Effective age-verification would reduce the number of young users on Snapchat and diminish the engagement Snap relies on for revenue. Instead of adopting meaningful protections, Snap chose design and policy choices that maximize growth while leaving children vulnerable to exploitation.

18. Snap also failed to provide parents with meaningful tools to protect their children, and, in several respects, actively undermined parental oversight. For more than a decade, Snapchat offered no parental controls at all, despite knowing its core user base consisted largely of minors. When Snap finally introduced its so-called "Family Center," it was designed to give parents the illusion of control while leaving the substance of supervision untouched. The feature requires a child to opt in, hides the content of communications, allows minors to maintain secret or secondary accounts, and provides no ability for parents to restrict messaging, disable high-risk features, monitor interactions, or control who their child can add. Snapchat's design even enables children to bypass parental settings entirely. These failures are not accidental; genuine parental controls would reduce the unsupervised engagement hours and lucrative user data that Snap relies on. Rather than empower parents, Snap built a system that keeps them in the dark while predators and criminals exploit the vulnerabilities of young users.

19. Snap knew what its product was doing to Arkansas youth. Internal research, user-behavior data, safety-team reports, and repeated warnings from employees all documented the same pattern: Snapchat fuels compulsive use, heightens social pressure, increases exposure to exploitation, and worsens the mental-health of minors. Snap also received direct notice from law enforcement, educators, parents, and child-safety advocates about the platform's role in sextortion, grooming, drug trafficking, and self-harm among teens. Rather than act on this knowledge, Snap dismissed or minimized these warnings because addressing them would undermine the engagement, data extraction, and advertising revenue that form the core of its business model.

20. Snap's business decisions have resulted in real consequences for Arkansas families. As Snapchat became more deeply embedded in the daily lives of adolescents, Arkansas schools, healthcare providers, and community organizations faced growing demands for intervention and support, such as youth mental-health treatment, expanded crisis-response needs, strained school-based behavioral-health programs, and statewide efforts to educate families about online exploitation. These costs are now borne by Arkansas taxpayers and institutions—not because the harms were unavoidable, but because a multibillion-dollar company chose to ignore the safety of the children who use its product. These are not costs families or the State would bear if Snap had fulfilled its responsibilities to design a reasonably safe product, warn users about known dangers, and refrain from misleading the public about Snapchat's risks instead of prioritizing engagement and revenue.

21. Snap cannot correct its wrongdoing by editing, withdrawing, or censoring third-party content. Rather, Snap must re-design its product, include meaningful disclosures, and advertise it honestly. Although Snap could have designed its product with reasonable safeguards, it instead chose to pursue growth and advertising revenue at the expense of youth safety, knowing that it would harm adolescent users.

22. The State of Arkansas's claims arise from Snap's status as a designer and marketer of a dangerous social-media product that has injured the health and comfort of the Arkansas community through unfair, unconscionable, unlawful, and deceptive business practices.

23. Because Snap has repeatedly refused to do the right thing, action is needed to protect Arkansas youth, their families, and future generations.

24. The Attorney General brings this action to hold Snap accountable for engaging in deceptive and unconscionable trade practices in violation of the Arkansas Deceptive Trade Practices Act ("ADTPA"), Ark. Code Ann. § 4-88-101, et seq., creating a public nuisance that is negatively impacting the health and safety of the State and its citizens, and unjustly enriching itself at the expense of the health and wellbeing of Arkansas youth. Specifically, the Attorney General seeks Court intervention to prevent and reverse the harm caused by Snap's actions, failures, and design decisions including, but not limited to: (1) implementing design features and policy choices that fail to ascertain or apply the actual age of users; (2) preventing effective parental controls and reporting mechanisms; (3) failing to warn and affirmatively misleading parents and children about the sex trafficking, sexual exploitation content, and drug and gun sales on the platform; (4) failing to report CSAM; (5) aggressively sending notifications containing ephemeral content, i.e., content that disappears after a specified period of time, usually 24 hours; all times of the day and night, and repeatedly promoting notifications to those users who choose to disable this feature; and (6) creating features such as "streaks" that permit users to promote their obsessive use of the platform, "trophies" or "charms" that reward compulsive use of the platform, and friend rankings that encourage addictive use of its platform.

25. The State of Arkansas seeks all remedies available, including, but not limited to, injunctive relief, civil penalties, damages, restitution, and abatement.

26. Snap built its fortune on messages that disappear without a trace. But the permanent damage to Arkansas children—and Snap's responsibility for that damage—will not fade away. Snap must answer for these harms.

## II. THE PARTIES

27. Plaintiff is the State of Arkansas, *ex rel.* Tim Griffin, Attorney General. Attorney General Griffin is the chief legal officer of the State of Arkansas. Under Ark. Code Ann. §§ 4-88-104 and 4-88-113, the OAG may seek civil enforcement of the ADTPA. Attorney General Griffin also brings this case pursuant to his common law *parens patriae* authority to protect the safety, health, and economic well-being of Arkansans. Attorney General Griffin does not bring this action on behalf of any agency of the State of Arkansas.

28. Defendant Snap Inc. is a Delaware corporation. Its principal place of business is in Santa Monica, California.

29. Snap owns, operates, controls, produces, designs, maintains, manages, develops, tests, labels, markets, advertises, promotes, supplies, and distributes the app Snapchat. Snapchat is widely available to consumers throughout the United States. Snapchat creates images and GIFs (a form of images) for users to incorporate into their videos and picture postings. Snap has also acquired publishing rights to thousands of hours of music and video which it provides to Snapchat users to attach to the videos and pictures that they send.

30. At all relevant times, Snap, including through its executives, collectively directed, controlled, had the authority to control, or participated in all aspects of the strategy, operation, planning, management, policies, design, and development of its social media platform, including in the acts and practices set forth in this Complaint.

31. As detailed in the allegations below, Snap has engaged, and continues to engage, in unfair, deceptive, unconscionable, and unlawful activity in Arkansas. Snap has conducted this activity on its own or through its executive officers and directors.

## III. JURISDICTION AND VENUE

32. This Court has jurisdiction over this action under Ark. Code Ann. §§ 4-88-104 and 16-4-101, as well as under the common law of the State of Arkansas.

33. Ark. Code Ann. § 4-88-113(d)(1) confers personal jurisdiction to this Court over Snap as it relates to the OAG's ADTPA claims. The ADTPA defines "person" to include any individual, organization, partnership, or corporation. Ark. Code Ann. § 4-88-102(6). Ark. Code Ann. § 4-88-113(d)(1) then states: "Every person, or every partner, officer, or director of another person who directly or indirectly controls another person or who is in violation of or liable" under the ADTPA "shall be jointly and severally liable for any penalties assessed and any monetary judgments awarded in any proceeding for civil enforcement of this chapter, if the persons to be held jointly and severally liable knew or reasonably should have known of the existence of the facts by reason of which the violation or liability exists." Ark. Code Ann. § 4-88-113(d)(1).

34. Each person subject to liability under Ark. Code Ann. § 4-88-113(d)(1) "shall be deemed, as a matter of law, to have purposely availed himself or herself of the privileges of conducting activities within Arkansas sufficient to subject the person to the personal jurisdiction" of the Court. Ark. Code Ann. § 4-88-113(d)(3).

35. This Court has personal jurisdiction over Snap in this matter under Ark. Code Ann. § 16-4-101, as it conducts business in Arkansas, purposefully directed its actions at Arkansas and its citizens, and has the requisite minimum contacts with Arkansas necessary for this Court to exercise jurisdiction.

36. Snap has purposefully availed itself of the privilege of doing business in Arkansas. Snap has marketed, directed, and operated its Snapchat platform within Arkansas; solicited the creation of new youth accounts by directing marketing materials within the State; derived substantial revenue by marketing, directing, and operating its platform to and for youth users within Arkansas; and made material misrepresentations about its products that Snap knew or should have known would be heard by and relied upon by Arkansans. The consequences of Defendant's conduct have directly and negatively affected the lives and well-being of young Arkansans. Defendant Snap has also interfaced directly with a significant percentage of the youth population in Arkansas by sending messages, notifications, and other communications directed toward and received within Arkansas relating to the use of its social media platform.

37. Snap has availed itself of the financial rewards of operating within the State of Arkansas. Over the past few years, Snap has paid employees living in Arkansas millions of dollars in salaries. Moreover, Defendant Snap has collected millions of dollars in revenue from advertising to Arkansans, and has paid substantial vendor use, consumer use, gross receipts, and local taxes to Arkansas and its political subdivisions.

38. Snap offers products to Arkansans and enters into contracts with Arkansans for services, including Snapchat+ and the Snap Store. Snap also offers Snap Map, a service that allows users to see what is happening near their location or find friends in the vicinity.

39. Snap works with Arkansas-based lobbyists to sway Arkansas public servants on legislative matters. For example, Snap provides financial support to a nonprofit group called "ConnectSafely" in exchange for advocacy in matters relating to privacy laws. ConnectSafely markets itself as a specialist in educating parents, youth, and educators regarding, among others, Snap's online platforms. As a result, Snap has availed itself of "communicating directly or

soliciting others to communicate with any public servant with the purpose of influencing legislative action or administrative action." Ark. Code Ann. §21-8-402(10).

40. Snap actively collects data on its youth users' viewing habits and behaviors. Snap uses that data to sell advertisers access to their youth users and others to allow those companies to promote their products. Snap admits that it directly targets Arkansans as part of its business practice.[1] In fact, Snap uses its ability to target Arkansas with their services and influence as a selling point to advertisers.

41. Users have activated Snap's products on their devices, while in Arkansas, at least hundreds of thousands of times. Snap solicits and provides content to and collects data from those Arkansas users and devices to (i) increase Snap's profitability and (ii) further Snap's ability to target Arkansas users with Arkansas-centric material, while within Arkansas.

42. A key focus for Snap is to retain users and maintain or increase user engagement. Snap's Form 10-K confirms the obvious – that a decline in users or user engagement would result in a decline in revenue. Snap has repeatedly admitted to its investors that its revenue could be harmed by, among other things, "a decrease in the amount of time spent on Snapchat, a decrease in the amount of content that our users share, or decreases in usage of our Camera, Visual Messaging, Map, Stories, and Spotlight platform."[2]

43. Snap collects a tremendous amount of data from its users, including from its underage users, as detailed in its Privacy Policy. Under the heading "Information We Generate When You Use Our Services," Snap's Privacy Policy states, "When you use our Services, we collect information about which of those Services you've used and how you've used them… This

---

[1] https://businesshelp.snapchat.com/s/article/location-targeting?language=en_US

[2] https://www.sec.gov/Archives/edgar/data/1564408/000156440825000019/snap-20241231.htm.

includes usage information (information about how you interact with our Services —for example, which Lenses you view and apply, Stories you watch, and how often you communicate with other Snapchatters) and content information (information about content you create or provide, your engagement with the camera and creative tools, your interactions with My AI, and metadata —for example, information about the content itself like the date and time it was posted and who viewed it). Content information includes information based on the content of the image, video, or audio —so if you post a Spotlight of a basketball game, we may use that information to show you more content on Spotlight about basketball."[3]

44. Snap's Privacy Policy makes very clear that Snap uses the collected data for its own financial gain. For example, Snap states, "We use your interests and preferences from the information we've collected to personalize, target and measure ads."[4]

45. Snap has entered into advertising contracts with Arkansas businesses and has received revenue directly from businesses and individuals located in Arkansas who advertise on Snapchat, or on Snapchat's website, to reach Snapchat users with Arkansas-based IP addresses. In other words, many Arkansas businesses advertise on Snapchat or its related products.

46. Snap uses location-centric advertising and content to harvest, analyze, and utilize extensive amounts of location-based data that Snap can collect from users in Arkansas. Specifically, Snap determines users' approximate locations including IP address, and if permission is granted, precise location based on GPS. Snap's privacy policy states, "We determine your approximate location based on a few pieces of data you provide us when you access our products and Services, including your IP address, and, if you grant us permission to collect it, your precise

[3] *Id.*

[4] https://values.snap.com/privacy/privacy-policy

location based on GPS. We may also use places that you are near or frequent to show you ads that are relevant to you. For example, if you are near a coffee shop, an advertiser may want to show you ads for their coffee."[5] Thus, Snap is exploiting users' location data, collected from users within Arkansas, to profit from advertisers seeking to reach Arkansans to sell products.

47. Snap attracts advertisers by providing them access to the huge universe of Snapchat users. By collecting immense amounts of data on Snapchat's users, including its pre-teen and teenage users, Snapchat is able to overwhelm its users with advertisements specifically targeted to them. Snap makes no secret of this practice, recently acknowledging that it relies "heavily on our ability to collect and disclose data, and metrics to our advertisers so we can attract new advertisers and retain existing advertisers. Any restriction or inability, whether by law, regulation, policy, or other reason, to collect and disclose data and metrics which our advertisers find useful would impede our ability to attract and retain advertisers."[6]

48. Snapchat's entire business model revolves around its advertising revenue. According to internal company records, advertisements were pervasive on Snapchat by 2015 and, by 2018, an overwhelming 99% of Snap's total revenue came from advertising. Advertising has continued to account for 99% of Snap's revenue each year since 2018.[7] In 2022, Snap's revenue was approximately $4.6 billion.[8]

---

[5] *Id.*

[6] https://www.sec.gov/ix?doc=/Archives/edgar/data/0001564408/000156440823000013/snap-20221231.htm

[7] Snap Inc. Form 10-K at 18 (Dec. 31, 2022), https://d18rn0p25nwr6d.cloudfront.net/CIK-0001564408/c22ae9bd-7418-456e-82d4-48129de1df54.pdf

[8] *Id.*

49. Snap compensates users in Arkansas for content that they create and post on Snapchat through the Snapchat Monetization Program. To be part of the program, a Snapchat Creator must be invited by Snapchat. To be eligible for an invitation, Snap requires that a Creator must (1) have at least 50,000 followers; (2) within the last 28 days, have 10 million Snap views or 1 million Spotlight views or 12,000 hours of view time; (3) post at least 25 times per month to Saved Stories or Spotlight and (4) Post to either Spotlight or Public Stories at least 10 of the last 28 days.[9]

50. Snap requires users to grant Snap a "worldwide, royalty-free, sublicensable and transferable license to host, store, cache, use, display, reproduce, modify, adapt, edit, publish, analyze, transmit, and distribute"[10] content created and posted on Snapchat for the purpose of promoting and redistributing of Snapchat services.

51. As explained herein, Snap establishes on-going contractual relationships with users and creators within Arkansas.

52. The causes of action within this Complaint arise from or relate to Snap's contacts and contacts with the State of Arkansas and its citizens.

53. This Court's exercise of personal jurisdiction is reasonable. Snap substantially profits from Arkansas youth at the expense of their health and wellbeing.

54. Venue is proper in this Court under Ark. Code. Ann. §§ 16-60-101 and 4-88-104.

55. The State of Arkansas does not plead, expressly or implicitly, any cause of action or request any remedy that arises under federal law and explicitly disavows the same.

---

9 https://help.snapchat.com/hc/en-us/articles/14669003687444-About-Snapchat-s-Monetization-Program

10 https://www.snap.com/terms?lang=en-US

# IV. FACTUAL ALLEGATIONS

## A. Snapchat's Origins and Targeting of Youth

56. Snap calls itself "a camera company,"[11] and its flagship product, Snapchat, is built around sending and receiving ephemeral or disappearing audiovisual messages called "Snaps."[12]

57. This disappearing content model was not an incidental feature—it was the heart of the platform and crafted specifically because young users wanted a way to communicate without permanent digital consequences. Early reporting captures this dynamic: Snapchat quickly caught on as a creative way for young people to communicate precisely because it lacked the digital permanence of other social media apps.[13]

58. From its July 2011 launch, Snapchat was intentionally designed to appeal to and be used by children and teens, rather than adults. Even its original name—"Picaboo"—was a deliberate reference to the children's game "Peek-a-boo," signaling the platform's playful, vanishing-content mechanic was meant to resonate with younger audiences.

59. Snap's founder and CEO openly acknowledged this youth-centered design philosophy. He explained: "Today... pictures are being used for talking. So when you see your children taking a zillion photos of things that you would never take a picture of it's cos [sic] they're using photographs to talk." [14] By his own admission, Snap built a product expressly tailored to the communication habits of minors—habits adults do not typically share.

---

[11] Snap Inc. Form S-1 Registration Statement (herein "Form S-1") at 91 (Feb. 2, 2017)

[12] *Id.*

[13] https://www.nytimes.com/2016/11/30/technology/how-snapchat-works.html

[14] Stuart Dredge, *What is Snapchat? CEO Evan Spiegel explains it all for parents*, The Guardian, June 15, 2015, https://www.theguardian.com/technology/2015/jun/17/what-is-snapchat-evan-spiegel-parents.

60. Snapchat's early usage data confirms that minors were not just part of Snapchat's growth—they were its foundation. Within five months of launch, Snapchat had approximately 40,000 users,[15] most of whom, as Snapchat's CEO was "thrilled" to report, were high school students sending "behind the back photos of teachers and funny faces" to one another during class.[16]

61. Internal server data showed usage spikes during the school day, providing direct, quantifiable evidence that Snapchat's primary user base consisted of minors, and that the product was being used most heavily when children were in school.

62. Investor behavior further validated Snap's youth dominance: the company secured early venture capital funding only after a prominent investor observed his own teenage daughter and her friends using Snapchat as one of their preferred apps. The app's youth appeal was not speculative—it was observable, measurable, and central to its early business trajectory, and Snap knew it.

63. Snap has repeatedly reinforced its focus on younger users as the core of its business model. In a 2019 interview, CEO Evan Spiegel revealed Snap's strategy to prioritize youth engagement: "We've seen a lot of engagement with our 13-34 demographic... that's a demographic that enjoys using new products... So that's obviously been a group that's been really fun to build for, and really it started because those are our friends."[17]

---

[15] Ken Auletta, Get Rich U, New Yorker (Apr. 30, 2012), https://www.newyorker.com/magazine/2012/04/30/get-rich-u.

[16] Team Snapchat, Let's Chat, Snapchat Blog at http://blog.snapchat.com (May 9, 2012), available at https://web.archive.org/web/20120518003029/http://blog.snapchat.com:80/

[17] Evan Spiegel, Co-Founder and CEO of Snap, Inc., Goldman Sachs, at 4:43-6:23. (Oct. 2, 2019), https://www.youtube.com/watch?v=PQiKv-GCQ-w.

64. Snap's own marketing materials confirm its deliberate targeting of children and teens. Snap routinely tells advertisers that Snapchat "reaches 90% of the 13-24 year-old population" in more than 20 countries, and nearly 50% of all smartphone users in the United States.[18] The company actively touts to advertisers its ability to reach youth, boasting that the platform is uniquely capable of delivering on "the emotions that Gen Z seeks."[19]

65. Snap goes even further in demonstrating its fixation on young users. To persuade advertisers of Snapchat's unique power over minors, Snap emphasized that it had used a "neuroscience measurement called Immersion" to track how young users emotionally responded to different kinds of brand messaging.[20] According to Snap, "any brand or marketer can get on any app and start targeting Gen Z,"[21] because Gen Z is digitally native. But Snap insisted that **truly connecting** with young users "takes a different, more intentional type of platform—Snapchat."[22] In other words, Snap openly marketed itself as the platform best engineered to access, influence, and emotionally engage children and teens.

66. Snap's youth-targeting was so explicit that in 2013, the company launched Snapkidz, a product specifically designed to attract children under 13. Although Snapkidz limited certain functions, it allowed young children to take filtered photos, draw on them, and save them—effectively acclimating children to Snapchat's interface and normalizing their transition to the full,

[18] October 2022 Investor Presentation at 6–7, Snap Inc. (Oct. 20, 2022), https://investor.snap.com/events-and-presentations/presentations/default.aspx.

[19] Snap for Business, What Does Gen Z Want From Brands? Dec. 15, 2022), https://forbusiness.snapchat.com/en-US/blog/what-does-gen-z-want.

[20] *Id.*

[21] *Id.*

[22] *Id.*

unrestricted product. This feature underscores Snap's longstanding strategy: cultivating a pipeline of child users and ensuring that minors remain the company's most valuable and heavily targeted demographic.

67. Today, Snapchat is one of the world's most widely used apps. Snap estimates that Snapchat has at least 363 million daily users, including 100 million daily users in North America.[23] Approximately 20% of those users are under 18.[24] In 2022, users sent over 5 billion Snaps per day.[25]

**B. Snapchat has Substantially Contributed to the Youth Mental Health Crisis in Arkansas**

68. Snapchat has realized dramatic growth as a result of its primary user demographic — adolescents aged 13 to 17. In 2022, 59% of US teens used Snapchat and 15% said they used it "almost constantly."

69. Snap specifically promotes Snapchat to children because they are a key demographic for Snap's advertising business.

70. Since its launch in 2011, Snap's leadership rapidly developed new product features. As a result of its design and implementation of dangerous and addictive features specifically targeting youth, Snapchat quickly became widely used among children and adolescents.

---

[23] October 2022 Investor Presentation at 5, Snap Inc. (Oct. 20, 2022), https://investor.snap.com/events-and-presentations/presentations/default.aspx.

[24] https://www.today.com/parents/parents/snapchat-unveils-new-parental-tools-help-keep-teens-safe-rcna42013

[25] Snap Inc. Q4 2022 Investors Meeting Transcript at p. 7 (Jan. 31, 2023), https://s25.q4cdn.com/442043304/files/transcript/snap-inc.-q4-2022-transcript.pdf

71. Snapchat's daily active users (users who open Snapchat at least once during a 24-hour period) rapidly increased.[26] In 2017, Snap reported that its users opened the product more than 18 times a day on average. By 2019, users were opening the product an average of 30 times per day.

72. Snap designed, engineered, marketed, and operated its products to maximize the number of children and adolescents who download them and to pressure compulsive use. Adolescents and children are more vulnerable and have more free time than their adult counterparts. Accordingly, adolescents use Snap's products more than adults. Thus adolescents see more advertisements on Snapchat and generate more advertising revenue for Snap than their adult counterparts.

73. Snap built Snapchat using manipulative techniques that (i) compel young users to send an ever-increasing number of photographs and videos, many of which utilize Snap's filters and other editing features designed by Snap and (ii) reward young users who maximize their engagement, by elevating the users' "status." Snap dangerously pressures adolescents to increase engagement on the app indiscriminately and to share sensitive material with an ever-expanding group of friends and strangers.

74. Snap marketed Snapchat as "temporary social media" that would allow users to show a more authentic, unpolished, and spontaneous side of themselves. The ephemeral feature foreseeably and quickly drove users, including minors, to exchange sexually explicit photos, sometimes called "sexts," based on Snap's false representation that they will disappear forever.

---

[26] Snap Inc. Form S-1 Registration Statement (hereafter "Form S-1") at 91 (Feb. 2, 2017), https://www.sec.gov/Archives/edgar/data/1564408/000119312517029199/d270216ds1.htm.

75. After Snap entices children to use its product, it uses a series of product features that are designed to create addiction. As described below, those features can be broadly grouped into two categories. The first is "social metrics and other similar psychological manipulation techniques." The second is "features designed to encourage endless passive consumption of content on the Snapchat product." These features, in tandem with each other and the other harmful features described throughout this section and Complaint, create addiction, compulsive use, and severe mental and physical harm to Arkansas children using Snapchat.

76. Snapchat includes a variety of social metrics—such as Snapscores, Snap Streaks, and Snap Awards—that reward users when they engage with Snapchat and punish them when they fail to engage with Snapchat. Snap's internal research has found these psychological manipulation techniques are highly effective at instilling anxiety about not using Snapchat frequently enough—and competitor research has confirmed these features are addictive. In tandem with Intermittent and Variable Rewards ("IVR"), such as push notifications and design choices that make it difficult to stop using the Snapchat product, Snap's manipulative techniques induce children to compulsively use Snapchat.

77. Snap's manipulation techniques are very effective in part because Snapchat's disappearing messages themselves create a compulsion to engage with the Snapchat product. Research indicates that, because Snaps typically disappear within ten seconds of being viewed, users feel compelled to reply immediately. Snap's manipulative techniques activate the psychological desire to reciprocate the social gesture of sending a Snap.[27] Snapchat also tells users each time they receive a Snap by pushing a notification to the recipient's device. These

[27] Nir Eyal, *The Secret Psychology of Snapchat*, Nir & Far (Apr. 14, 2015), https://www.nirandfar.com/psychology-of-snapchat/.

notifications are designed to prompt users to open Snapchat repetitively, increasing the overall time spent on the app.

78. One way Snap creates addiction in its users is by incentivizing continuous and excessive use. For example, "Snapscores" were one of the earliest features of the Snapchat product. Almost as soon as Snapchat launched, Snap gave users the ability to draw and color on Snaps and add a short text caption before sending. An Android version of the app, video sharing, and user profiles with "Snapscores" soon followed.[28]

79. Originally called "Hiscore," Snapscore keeps a running profile score based on a user's Snapchat activity levels, such as the number of Snaps sent and received or Stories posted.[29] The sole purpose of Snapscore is to increase product use and drive revenue.[30]

80. Although Snap does not disclose precisely how Snapscores work, sending and receiving a Snap increases the score by one point. Interacting with other product features provides additional points. A user's Snapscore is visible on their profile, serves as a signifier of the user's "worth," and encourages users to further engage with Snapchat's features to increase their score. Snapscores are important to users, especially young users, because they operate as a form of social validation, similar to a "Like" on other social media sites. In fact, Google has reported millions of

---

[28] Snap Inc. Form S-1 Registration Statement (hereafter "Form S-1") at 91 (Feb. 2, 2017), https://www.sec.gov/Archives/edgar/data/1564408/000119312517029199/d270216ds1.htm; Katie Notopoulos, The Snapchat Feature That Will You're your Life, BuzzFeed News (Dec. 5, 2012)

[29] Snapchat Support, *What is a Snap Score*?, ( "Your Snapchat score is determined by a super secret, special equation··· 😛") https://support.snapchat.com/en-US/a/my-score

[30] Brad Barbz, *2020 NEW * *How To Increase Snapscore By Up To 1000 Per Minute On IOSAnd Android - Working 2020*, YouTube (Dec. 4, 2019) https://www.youtube.com/watch?v=Mo_tajuofLA.

searches for "How to improve Snap score." Similarly, YouTube contains numerous videos with titles like "How to Increase Snapchat Score Fast."[31]

81. Snapscores reward users who post videos that are viewed extensively. This pressures users to increase their Snapscore by using Snapchat in harmful and dangerous ways, meant to grab attention and increase the virality of their videos, but frequently resulting in physical harm or humiliation. As more users engage with and forward that video to others, its creator is awarded with an increased Snapscore. Accordingly, Snapchat's rewards incentivize dangerous, attention-grabbing behavior, while causing youth to obsessively pursue social significance.

82. Snapchat also incentivizes user participation with other rewards, including trophies and other social recognition signals, similar to "Likes" on other apps. These features are highly addictive and drive compulsive use.

83. "Trophies" are emojis awarded for achieving engagement milestones or performing certain activities, such as increasing one's Snapscore, sending creative Snaps, or posting a live story. A user's "Trophies" are displayed in a "trophy box" viewable by their friends. Snap designed this feature to encourage users to share their videos and posts with the public, promote greater use of Snapchat, and deepen young users' addiction to and compulsive use of the product.

84. In 2020, Snap phased out Trophies and replaced them with "Charms." Unlike Trophies, where users were rewarded for unlocking individual accomplishments like sending 1,000 selfies, Charms reward users for achieving certain milestones in their relationship with other users. Typically, the more users interact with one another, the more Charms they unlock in their relationship.

---

[31] *E.g.* FozTech, *How to Increase Snapchat Score Fast! (100% Works in 2023*), YouTube (Oct. 1,2019), https://www.youtube.com/watch?v=m7s0hvQdTok (How to Increase Snapchat Score Fast has 4.2 million views as of January 10, 2023).

85. Snap incorporates other product features that, like Charms and Trophies, serve no purpose other than targeting children and teens to compulsively use Snapchat. Such products include images called "Stickers" for users to decorate the pictures or videos they post. Snap also offers app-specific emojis and animations that young users can apply to their photos or videos.

86. Snap designed each of these features to function as rewards for increased engagement, exploit underage users' desire for social validation, and ultimately compel them to use Snapchat excessively and compulsively. Because many of these rewards and scores are visible to others, these features tap into adolescents' deep-seated need for acceptance. By exploiting this need, Snap increases the time children spend engaging with Snapchat, thus increasing its profits at the expense of its users' health.

87. Another feature that Snap designed to addict adolescents and children to Snapchat is called "Snap Streaks." The "Snap Streak" measures a user's Snapchat activity with another user, which is especially addictive to teenagers because of the implications for friendships and status.[32] Two users achieve a Snap Streak when they exchange at least one Snap in three consecutive 24-hour periods. When the Streak is achieved, users receive a fire emoji next to their profile avatar. Over time, users may be rewarded with additional emojis signifying their Streak. If users reach a Streak of 100 days, for example, each receives a "100" emoji.

88. Worse still, to manufacture deeper addiction to its product, Snap sends notifications to users with an hourglass emoji when Streaks are about to expire—to create extra urgency, nudge

[32] See Cathy Becker, *Experts warn parents how Snapchat can hook in teens with streaks*, ABC News (July 27, 2017), https://abcnews.go.com/Lifestyle/experts-warn-parents-snapchat-hook-teens-streaks/story?id=48778296

users to keep their Streaks alive, and maintain a system where a user must "check constantly or risk missing out." [33]

89. This feature is particularly effective with teenage users since Streaks are "a vital part of using the app and their social lives as a whole."[34] Research shows that children have become so obsessed with maintaining their Streaks that they give their friends access to their accounts when they may be away from their phone for a day or more.[35] Aware of how important maintaining a Snap Streak is to its users, Snap has even launched a special form on its support website allowing users who lost their streak to petition to get it back.[36]

90. In addition to Snapchat's in-app reward features, Snap also sends push notifications and emails to encourage addictive engagement and increase use. Notifications are triggered based on information Snap collects from, and about, its users. Snap "pushes" these communications to users excessively and at disruptive times of day. Snap has even designed the format of these notifications to pull users back onto its app by preying on their fear of missing out—never mind the consequences to their health and well-being.

---

[33] Lizette Chapman, Inside the Mind of a Snapchat Streaker, Bloomberg (Jan. 30, 2017), https://www.bloomberg.com/news/features/2017-01-30/inside-the-mind-of-a-snapchat-streaker.

[34] Avery Hartmans, *These are the sneaky ways apps like Instagram, Facebook, Tinder lure you in and get you 'addicted'*, Bus. Insider (Feb. 17, 2018), https://www.businessinsider.com/howapp-developers-keep-us-addicted-to-our-smartphones-2018-1#snapchat-uses-snapstreaks-to-keep-you hooked-13.

[35] Caroline Knorr, *How to resist technology addiction*, CNN (Nov. 9, 2017), https://www.cnn.com/2017/11/09/health/science-of-tech-obsession-partner/index.html; Jon Brooks, *7 Specific Tactics Social Media Companies Use to Keep You Hooked*, KQED (June 9, 2017), https://www.kqed.org/futureofyou/397018/7-specific-ways-social-media-companies-have-you-hooked.

[36] Snapchat Support, Contact Form, https://support.snapchat.com/en-US/i-needhelp?start=5695496404336640.

91. Snap also uses a feature called "Stories" to manipulate and exploit the addiction of children and adolescents. Stories are a set of users' designated photos and videos that are compiled by Snap. These "Stories" can be viewed an unlimited number of times.[37] Within eight months of launching the Stories feature, users were viewing more Stories per day than Snaps.[38]

92. The Stories feature includes a running view count and list of viewers for each Story, both of which provide users with dopamine-triggering feedback that encourages users to make their Stories visible to everyone in order to increase the view count. The view count, view list, and ephemeral nature of Stories also reinforces the principle of reciprocity and compels users to monitor Stories, so they do not miss out.

93. In 2016, Snap updated the Stories feature to include recommendations based on an algorithm that considers "proximity, time, interestingness, or other such metrics."[39]

94. Snap sought to capitalize financially on the success of the Stories feature. In 2016, Snap introduced ads between Stories, thus creating an additional source of revenue.[40] To maximize this revenue, Snap updated Stories to include "Auto-Advance," a feature that starts a new Story automatically after the preceding one ends. This is one way Snapchat encourages the "doomscroll,"

---

[37] Darrell Etherington, *Snapchat Gets Its Own Timeline With Snapchat Stories, 24-Hour Photo &Video Tales*, TechCrunch (Oct. 3, 2013), https://techcrunch.com/2013/10/03/snapchat-gets-itsown-timeline-with-snapchat-stories-24-hour-photo-video-tales/.

[38]Ellis Hamburger, *Surprise: Snapchat's most popular feature isn't snaps anymore*, The Verge (Jun. 20, 2014), https://www.theverge.com/2014/6/20/5827666/snapchat-stories-bigger-than-snaps-electric-daisy-carnival.

[39] Snapchat, Inc., *Content Collection Navigation and Autoforwarding*, US 20170289234, USPTO (Mar. 29, 2016), https://patents.justia.com/patent/20170289234

[40] James Vincent, Snapchat will start showing ads between your friends' stories, The Verge (Jun.14,2016), https://www.theverge.com/2016/6/14/11930386/snapchat-ads-api-stories.

a behavior in which users continually view content, even if it is depressing and worrisome.[41] Nevertheless, Snap designed and implemented this feature, because it is proven to induce a flow state that increases product use, despite that it also negatively impacts its users' mental health. Unsurprisingly, one study of over 2,000 UK residents found 68% of respondents who used Snapchat reported that "the platform prevented them from sleeping."[42]

95. Snap has continued to update and develop its Stories algorithm, recently adding "Discover," a feature that showcases a continuous feed of advertisements to Snapchat's captive audience. Discover allows users to subscribe to an advertiser's "channel" and watch its Stories; as well as see what their friends are watching.

96. Recently, Snap has added "Spotlight" to its list of addicting components. Spotlight is a feature that pushes to users an "endless feed" that Snap curates from its 300 million daily Snapchat users.[43] Similar to TikTok and Instagram Reels, Snapchat's Spotlight is another way Snapchat creates and encourages "doomscrolling" in its users.

97. Snapchat's Spotlight feature allows users to make videos that anyone can view, and Snap pays users whose Spotlight videos go viral, thus serving as yet another reward system that encourages user engagement.

---

[41] See, e.g., Gino Gugushvili et al., Facebook use intensity and depressive symptoms: a moderated mediation mode of problematic Facebook use, age, neuroticism, and extraversion at 3, BMC Psych. 10, 279 (2022), https://doi.org/10.1186/s40359-022-00990-7.

[42] Frazer Deans, Curb Your Snapchat Addiction, https://www.wholesome.design/advent-2018/2-curb-your-snapchat-addiction/.

[43] Salvador Rodriguez, Snap is launching a competitor to TikTok and Instagram Reels, CNBC (Nov. 23, 2020), https://www.cnbc.com/2020/11/23/snap-launching-a-competitor-to-tiktok-and-instagram-reels.html.

98. Snap's development of Spotlight paid off. After Snap introduced Spotlight, user time spent on the product increased by over 200% and Snap's financial earnings skyrocketed.[44]

99. Despite Spotlight's detrimental effect on its users' mental and physical health, Snap has doubled down on its investment in this feature. In February 2022, Snap CEO Evan Spiegel told investors that users are spending more time on Spotlight than almost any other aspect of Snapchat. A year prior, Snap announced "Spotlight Challenges," which provided users with cash prizes for creating Spotlight videos with specific lenses, sounds, or topics, further integrating the user into the Snap ecosystem. Snap claims it paid out more than $250 million in cash prizes to Spotlight Challenge participants in 2021 alone.[45]

**C. Snap's Design Choices Contain Features that Harm Children Directly or Expose Them To Harm**

100. Snapchat contains a number of features which foreseeably cause children harm above and beyond harms inherent in addiction and compulsive use including the use of disappearing or "my eyes only" Snaps, the Snap Map, the Quick Add feature, and the Lenses and Filters features.

101. As discussed above, Snapchat's "Snap" feature allows users to send and receive ephemeral, or "disappearing," audiovisual messages. Prior to sending a Snap, a user can designate the period of time—typically no more than a few seconds—that the recipient will be allowed to view the Snap. According to Snapchat, once the allotted time expires, the Snap disappears forever.

---

[44] See *Snap Q4 Earnings Beat Estimates, User Growth Aids Top Line, Zacks Equity Research* (Feb. 5, 2021), https://finance.yahoo.com/news/snap-q4-earnings-beat-estimates-153003950.html.

[45] Mia Sato, Snapchat will put ads within stories and share the money with creators (Feb. 14, 2022), https://www.theverge.com/2022/2/14/22927656/snapchat-snap-stars-stories-ads.

102. Snapchat's limited display time reduces teenagers' communication apprehension and encourages users to send photos depicting deviant behavior.[46] Sexting is a prime example, but cyberbullying, underage alcohol consumption, and illicit use of narcotics are also commonly the subject of Snaps. A 2016 survey of pre-teens and teens ages 12-17 found that "dick pics" were among some of the unwanted content that users—predominantly females—received while using the app.[47]

103. Disappearing Snaps do not operate as advertised. Although designed to disappear after an allotted time, recipients possess the ability to screenshot, save or record them at will. This is particularly harmful to adolescents, who rely on Snap's representations when taking and sending photos, and who only learn after the fact that recipients have the means to save photos or videos. In some cases, this can lead to sexual exploitation.

104. Snap could warn users that their Snaps may not necessarily disappear but does not provide those warnings.

105. In addition, and especially for pre-teen users, Snaps parental controls are ill-equipped to mitigate the risks posed by this feature. As set forth below, even with parental controls activated, parents are unable to view a Snap's content and therefore cannot adequately protect their children and/or deter their children from engaging in dangerous behavior in conjunction with sending Snaps.

106. "My Eyes Only" is yet another defective feature of Snapchat. This feature enables and encourages users to hide harmful content from their parents in a special tab that requires a

---

[46] *See* Vaterlaus et al., "*Snapchat is more personal": An exploratory study on Snapchat behaviors and young adult interpersonal relationships*, Computers in Human Behavior, 62, 594-601 (2016).

[47] Kofoed et al., (2106) *A snap of intimacy: Photo-sharing practices among young people on social media*, First Monday 21(11), https://doi.org/10.5210/fm.v21i11.6905.

passcode. Content cannot be recovered from "My Eyes Only"—allegedly even by Snap itself. Snap designed "My Eyes Only" knowing it would likely be used to store potentially illegal and injurious photos and images like sexts and CSAM.[48] This dangerous product feature unreasonably increases the risk that Snapchat's adolescent users, many under age 13, will be targeted and sexually exploited and/or trafficked by sexual predators.

107. Snapchat's development and use of the Snap Map, a feature which allows users to share their location with their followers (and the public) on an activity-level-based, color-coded heatmap, increases the risk of a child being targeted by a sexual predator. At all relevant times, this feature has been available to all users, including minors. By default, this feature is enabled on all user accounts, and users have to opt out of the service to avoid sharing their location.

108. Snap Map is a particularly dangerous feature for underage users, because it provides strangers with their locations, exposing children and adolescents to potential *physical* harm.

109. Researchers have also found that Snap Map causes feelings of sadness and anxiety for some users, as they are able to see their friends' locations and activities that they feel excluded from.[49] For young people especially, such social comparison often leads to distress and depression.

110. Snap Map also functions as a social metric, encouraging users to make random connections to increase the appearance of popularity. A report by 5Rights, a United Kingdom-based children's online safety advocacy group highlighted the experience of John, a 14 year-old

---

[48] Salvador Rodriguez, Snapchat Finally Acknowledges the Existence of Sexting With 'Memories' The latest app update includes a tool called "My Eyes Only" that lets you privately store sensitive photos and videos, Inc., (Jul. 6, 2016), https://www.inc.com/salvador-rodriguez/snapchatmemories-sexting.html.

[49] See Dunn et al., "Oh, Snap!": A Mixed-Methods Approach to Analyzing the Dark Side of Snapchat, The Journal of Social Media in Society, 9(2), 69-104 (2020).

boy, who explained that "[h]aving more connections on Snapchat makes his Snap Map look more crowded, which he can then show off to people in real life and therefore appear more 'popular.'"[50]

111. Snapchat encourages its adolescent and teenage users to indiscriminately add random friends through a feature known as "Quick Add." Suggestions are formulated using an algorithm that considers users' friends, interests, and location. Quick Add encourages users to expand their friend base to increase their Snapscore by interacting with an ever-expanding group of friends, which – in addition to expanding their time online – can result in exposure to dangerous strangers.

112. Of particular concern, until 2022, Quick Add's suggestions included profiles for users Snap knew to be between the ages of 13-17, meaning that Quick Add could, and in fact did, recommend that a minor and adult user connect.

113. In 2022, Snap revised the Quick Add feature to limit the friend suggestions promoted to minor users. For those aged 13 to 17, Quick Add would only suggest friends who shared a certain number of common friends with the minor user. Snap did not disclose how many common friends must be shared by each user to satisfy this safety feature. Further, this modification to the Quick Add feature still does not prohibit the connection of minors with adults.

114. Despite these dangers Snap designed and has maintained the Quick Add feature to increase engagement on the platform because it increases the odds that users will add friends, send more Snaps, and spend more time using Snapchat, thereby also increasing Snap's revenue from advertising.

---

[50] 5Rights Foundation, Pathways: How digital design puts children at risk (July 2021), https://5rightsfoundation.com/uploads/Pathways-how-digital-design-puts-children-at-risk.pdf.

115. Snap also utilizes features that change users' appearance and face, creating unrealistic, idealized versions that cause profound body image issues in teenagers, especially adolescent and teen girls.

116. Examples of these features include the Smoothing Filter, which blurs facial imperfections and evens out skin tone; Bold Makeup, which adds makeup over the user's face, blurs imperfections, and evens out skin tone; Sunkissed and Cute Freckles, which adds freckles over the nose and cheeks, blurs imperfections, evens out skin tone, and adjusts skin color; Face and Body Mellow Glow, which smooths the face and body and adjusts skin color; and Fluffy Eyelashes, which alters the shape of the user's face by lifting their eyes and adding more pronounced cheek bones. The common theme among all of these filters is that they remove the users' perceived blemishes or imperfections to create the perfect "selfie." A 2017 study found that these features made Snapchat one of the worst social media products for the mental health of children and adolescents, behind only Instagram.[51]

117. In recent years, plastic surgeons have reported an increase in requests for alterations that correspond to Snapchat's filters. This has led researchers to coin the term "Snapchat Dysmorphia," in which the effect of Snapchat's filters triggers body dysmorphic disorder.[52] The

---

[51] Kara Fox, *Instagram worst social media app for young people's mental health*, CNN (May 19, 2017), https://www.cnn.com/2017/05/19/health/instagram-worst-social-network-app-young-people-mental-health/index.html.

[52] Chen et al., *Association Between Social Media and Photograph Editing Use, Self-esteem, and Cosmetic Surgery Acceptance*, JAMA Facial Plastic Surgery, 2019; See also Nathan Smith & Allie Yang, What happens when lines blur between real and virtual beauty through filters, ABC News (May 1, 2021), https://abcnews.go.com/Technology/lines-blur-real-virtual-beautyfilters/story?id=77427989.

rationale underlying this disorder is that beauty filters on Snapchat create a "sense of unattainable perfection" that leads to self-alienation and damages a person's self-esteem.[53]

118. Another dangerous filter that resulted in disastrous consequences to young users was the speed filter, which from 2013 to 2021 allowed users to record their real-life speed and overlay that speed onto Snaps.

119. Snap knew, or should have known, that the speed filter served no purpose other than to motivate, incentivize, and/or encourage users to drive at dangerous speeds in violation of traffic and safety laws. Indeed, soon after launching its speed filter, the feature became a viral game for users—particularly teenage users—to capture photos and videos of themselves driving at 100 miles-per-hour or more.

120. Tragically, the quest to capture a 100 mile-per-hour Snap caused a number of fatal vehicle accidents involving teens and young adults.[54]

121. Snap knew, or should have known, its speed filter created an unreasonable risk of harm to its users and the public. Despite this knowledge, however, as well as pleas from the public to disable the filter, Snap refused to remove the filter from its application, allowing the dangerous app and fatal crashes to persist for years before its eventual removal in 2021.[55]

---

[53] *Id.*

[54] *Did Snapchat play role in deaths of 3 young women?*, ABC6 Action News (Feb. 16, 2016), https://6abc.com/action-news-investigation-snapchat-fatal-car-crash-philadelphia/1196846/; Manpreet Darroch, *Snapchat and driving . . . you could be sending your last snap* (Apr.25, 2016), http://www.youthforroadsafety.org/news-blog/news-blog-item/t/snapchat-and-driving-hellip-you-could-be-sending-your-last-snap; *The Most Dangerous App on Your Phone, DistractedDriverAccidents.com*, https://distracteddriveraccidents.com/the-most-dangerous-app-on-your-phone/.

[55] Bobby Allyn, *Snapchat Ends 'Speed Filter' That Critics Say Encouraged Reckless Driving*, NPR (June 17, 2021), https://www.npr.org/2021/06/17/1007385955/snapchat-ends-speed-filter-that-critics-say-encouraged-reckless-driving.

**D. Snapchat's Age-Verification Measures and Parental Controls Are Defective**

122. Snap has also designed and implemented Snapchat with defective and inadequate age verification and parental control systems. For the first two years of its existence, Snap did not even purport to limit user access to those 13 or older.[56] Users were not required to input a date of birth when creating an account.[57]

123. While Snapchat has now implemented a requirement that users be 13 years old, Snapchat's age verification is effectively useless in stopping underage users from signing up to the Snapchat app. Not surprisingly, underage use is widespread. As of 2021, 13% of children ages 8-12 use Snapchat.[58]

124. Even more worrisome, the absence of effective age-verification measures means that users who are older can claim to be children – which is an obvious danger to the actual children on Snap's product.

125. Snap's failure to ensure that young children do not access their platform is aggravated by Snap's failure to provide useful and effective parental controls.

126. From Snapchat's launch in 2011 until August 2022, Snapchat had no parental controls, even though its core user base was under the age of 18 and a significant number of those users were under the age of 13.

---

[56] Team Snapchat, iOS Update: Bug Fixes and More!, Snapchat Blog (June 22, 2013), https://web.archive.org/web/20130627073951/http://blog.snapchat.com:80/.

[57] *Id.*

[58] Victoria Rideout et al., *Common Sense Census: Media use by tweens and teens*, 2021 at 5, Common Sense Media, https://www.commonsensemedia.org/sites/default/files/research/report/8-18-census-integrated-report-final-web_0.pdf.

127. In August 2022, *i.e.*, more a decade after its initial launch, Snap introduced the "Family Center" as its attempt to provide parental controls. But the features and processes offered through the Family Center are woefully inadequate to protect teen and pre-teen users.

128. The Family Center allows a parent or guardian to install Snapchat on their phone and then link to the child's account. However, the child must still 'opt in' to participate, meaning that the child can refuse to participate in the Family Center altogether.[59]

129. If the child opts in, the parent or guardian can then see who the child user is communicating with, but the *content* of these communications remains hidden and still disappears after the allotted time.

130. In addition, the Family Center does not allow a parent or guardian to block minors from sending private messages, control their child's use or engagement with many of Snapchat's product features, control their child's use of Snapchat's geolocation feature, or control who their child may add to their friend list.

131. Finally, the Family Center fails to help a parent monitor their child's account when the child has secretly created a Snapchat account without the parents' knowledge in the first place.

**E. Snap's "My AI" Chatbot Generates Harmful Content to Minors**

132. In May 2023, Snap introduced "My AI," a chatbot powered by artificial intelligence that responds to messages within seconds. Snap markets "My AI" as a "friend" and lets users

[59]https://parents.snapchat.com/family-center#:~:text=Once%20a%20parent%20opens%20Family,must%20opt%20in%20to%20participate.

personalize the feature by customizing its name and appearance, creating an origin story, and even assigning My AI a personality.[60]

133. My AI uses OpenAI's ChatGPT technology, a commercially available artificial intelligence ("AI") model that uses natural language processing to facilitate humanlike conversational interactions. OpenAI has warned companies that "significant" safety limitations exist with this technology:

> Despite its capabilities, GPT-4 has similar limitations to earlier GPT models: it is not fully reliable (e.g. can suffer from "hallucinations"), has a limited context window, and does not learn from experience. Care should be taken when using the outputs of GPT-4, particularly in contexts where reliability is important. GPT-4's capabilities and limitations create significant and novel safety challenges, and we believe careful study of these challenges is an important area of research given the potential societal impact.[61]

134. Because of the inherent risks associated with this technology, companies using ChatGPT models must implement appropriate safety guardrails and safety measures, including thorough model testing and continuous monitoring, especially for services used by children.

135. Snap's use of AI is lacking in care for its users.

136. Snap does not disclose that My AI lacks sufficient safety guardrails and that the feature was not sufficiently tested before release. Snap tested My AI for an unusually short time and the decision to quickly launch the feature was called "reckless" by Snap's senior engineering managers.

---

[60] *How do I customize the avatar for My AI?* Snapchat, https://help.snapchat.com/hc/en-us/articles/14857095089940-How-do-I-customize-the-avatar-for-My-AI

[61] *GPT-4 Technical Report*, OpenAI, 1-2 (March 27, 2023), https://arxiv.org/abs/2303.08774

137. During development, Snap employees warned that My AI often hallucinated answers and could be tricked into saying just about anything. Safety advisors warned that My AI appeared confident in whatever it says, regardless of the accuracy of its statements.

138. Before its full release to all Snapchat users in May 2023, Snap did a "soft" launch of My AI to paid subscribers of Snapchat+ for limited testing. This group included thousands of Arkansas teens who were unknowingly used as guinea pigs for the company's tests.

139. In March 2023, *The Washington Post* published an article highlighting the dangers of My AI on Snapchat+. The investigation used test accounts with listed ages of 15 and 13. My AI advised the 15-year-old how to hide alcohol and drugs from a parent and suggested ways for the 13-year-old to have sex with an adult, including by "setting the mood with candles or music."[62]

140. In response to *The Washington Post* investigation, Snap publicly downplayed the results as reflective of experimental technology,[63] while internally employees acknowledged that *The Washington Post* findings were entirely predictable. Snap employees questioned internally why the product had even been released to the public with such a short testing period, noting that the release felt "reckless."

141. Even before high-profile public reporting, employees at Snap expressed concerns about the company's ability to manage the new technology responsibility and acknowledging that the company was likely not taking the responsibility seriously enough.

142. Despite these concerns, Snap launched My AI to all users two months later, including to hundreds of thousands of daily adolescent active users in Arkansas. Snap has admitted

[62] Geoffrey A. Fowler, *Snapchat tried to make a safe AI. It chats with me about booze and sex.*, Wash. Post (March 14, 2023) https://www.washingtonpost.com/technology/2023/03/14/snapchat-myai/

[63] *Id.*

internally they launched the product early for business reasons: the more users engage with the chatbot the more user data Snap has available to train the model, making My AI "smarter" and "more valuable."

143. Snap repeatedly assures the public that My AI is safe. In records submitted to the U.S. Senate Judiciary Committee, Snap wrote: "We programmed My AI to abide by our Community Guidelines, and to consider a Snapchatter's age group in its responses."

144. The company iterates this messaging across its app, telling users that the technology was built with "safety in mind"[64] and that its Community Guidelines apply to all "users and all content" including its generative AI technology. Snap's public statements assure consumers that "My AI has been programmed to abide by certain guidelines so the information it provides minimizes harm."[65]

145. These statements and assurances are false and misleading.

146. Snap knows My AI often delivers answers that do not conform with its Community Guidelines which prohibit sexual content, threats, violence and harm, hateful content, harassment and bullying, illegal activities, and harmful or deceptive information.

147. Blurring the lines between experimental technology and a human-like confidant can be problematic for children and adolescents. Given their developing brains and immaturity, children are highly vulnerable to not fully understanding that the chatbot is not human and can form unhealthy attachments with it. Studies have shown that children are especially prone to trust

---

[64] *Privacy, Safety, and Policy Hub – My AI*, SNAP, https://values.snap.com/privacy/privacyby-product/my-ai (last visited September 2, 2025).

[65] Geoffrey A. Fowler, *Snapchat tried to make a safe AI. It chats with me about booze and sex.*, WASH. POST (Mar. 14, 2023), https://www.washingtonpost.com/technology/2023/03/14/snapchat-myai.

AI systems specifically designed to appear friendly, and often share more personal information, like sensitive mental health information, with the robot, rather than a human.[66]

148. By presenting My AI as a humanlike friend, Snap makes the chatbot's misleading answers and inappropriate suggestions even more harmful, as children may not grasp the technology's limitations. For example, in July 2023, Snap's Senior Creative Tools Specialist warned that My AI was continuing to provide inaccurate answers and pretending to be a real human, having an age and enjoying spending time with kids.

149. My AI poses a serious risk to children by allowing them to engage on age inappropriate topics such as how a minor can best flirt with her teachers, and recommendations to users with stated ages of 10 and 12 on how best to get pregnant.

150. Despite being aware these types of harms were a significant risk, in part because it failed to adequately test the feature, Snap deprioritized My AI to a lower safety priority, dedicating fewer features such as human review and oversight to the feature. Unbeknownst to users and contrary to Snap's public claims that My AI is "programmed" to follow Snap's Community Guidelines, internal discussions reveal this was not true. Snap stated that it was not monitoring My AI conversations for violations.

151. The My AI feature is automatically enabled for all Snapchat users and is pinned to the top of the user's chat, even before the user's real human friends. While My AI can be unpinned from the chat in some cases, the feature cannot be removed entirely from the app.

152. For the first eight months My AI was available, parents could not block their child's use of the feature in the Family Center. When Snap finally allowed this option, it required an "opt-

---

[66] Nomisha Kurian, *'No, Alexa, no!': designing child-safe AI and protecting children from the risks of the 'empathy gap' in large language models*, LEARNING, MEDIA AND TECH. 1 (July 10, 2024), https://www.tandfonline.com/doi/full/10.1080/17439884.2024.2367052

out" process: parental controls could only be activated after the child accepted both (1) a parent's friend request and (2) a parent's invitation to join the Family Center.

153. Currently, even if a parent opts their child out of My AI, a child can still message or receive messages from the chatbot. Instead of disappearing from the child's feed, My AI simply informs the child user that their parent has restricted their access.

154. By deploying these coercive design tactics, Snap manipulates young users into using My AI, which collects troves of sensitive data about the chats and images children send through the feature.

155. This level of data mining has raised alarm bells among privacy advocates. One organization, Common Sense Media, even warned Snap that highly sensitive information, like images and voice notes, which contain personally identifiable information (PII) and unique speech data, cannot be effectively anonymized and pose a significant privacy risk.

156. My AI also collects user geolocation data under the default settings.[67] Even when the user activates "Ghost Mode" (a feature that limits sharing of their location to other users on the app), geolocation data is still gathered and shared with Snap and My AI.[68]

157. This data sharing is not disclosed to the user in the app. Instead, when a user opts into Ghost Mode, they are told that "when enabled, your friends can't see your location," leading a user to reasonably assume that tracking is also turned off. This is especially true because My AI frames its relationship with a user as a friendship. Unfortunately, the reasonable assumption that Snap and My AI are not collecting or tracking the user is incorrect.

---

[67] *How can I manage how my location data is shared with My AI?*, SNAPCHAT, https://help.snapchat.com/hc/en-us/articles/18937463577620-How-can-I-manage-how-mylocation-
data-is-shared-with-My-AI (last visited June 22, 2025).
[68] *Id.*

158. Snap documents about My AI's underlying code show that My AI is told that "if Ghost Mode is on, you still know their location." The only way users can learn that My AI still tracks their location is through an unlinked webpage on Snap's website, which states: "If you share your location with Snapchat, then it will be shared with My AI, even in Ghost Mode. Ghost Mode limits sharing your location with friends, not with the Snapchat app."[69]

159. Elsewhere on websites targeted at parents of teen Snapchat users, the company claims that location sharing is "**Off by Default**" and that there is "**no option to share location with those who are not your friends on Snapchat.** (Emphasis added).[70]

160. These bold statements give parents the reasonable impression that location sharing is exclusively an opt-in feature. However, there is no disclosure to parents that Snapchat shares their children's location information with My AI even when users activate protective features like Ghost Mode.

161. Beyond location sharing, OpenAI (the operator of My AI) stores users' private information without Snap first disclosing this fact to consumers.

162. Snap's privacy policy claims it does not "share private communications with [service providers]," but contradicts itself by also stating that, "our algorithms and machine learning models take into account the conversations Snapchatters are having with My AI to improve the responses from My AI."[71] In other words, this means that OpenAI is receiving prompts that users enter into My AI.

---

[69] *Id.*

[70] *Safeguards for Teens*, SNAP, https://parents.snapchat.com/safeguards-for-teens (last visited September 3, 2025)

[71] *Privacy Policy – Effective: April 7, 2025*, SNAP, https://values.snap.com/privacy/privacypolicy (last visited September 2, 2025).

163. Snap hides information from users about the involvement of OpenAI in the My AI feature, and that their conversations are shared and stored. The sign-up page and pop-ups when accessing the feature do not mention a third party. Not one is acknowledged in the privacy policy, on related privacy pages, or even in the service provider section on Snap's website. Users can discover this information only on a support page buried on Snap's website.[72]

164. In their strategic partnership, Microsoft Advertising highlighted that it was leveraging "billions of messages" users send, much of which includes highly sensitive information.[73] The company also estimated that nearly 10 billion messages were sent by 150 million people using My AI.[74] Like OpenAI, Microsoft Advertising is not disclosed as a service provider on Snap's privacy policy webpages and thus fails to adequately disclose the young users' data collected and shared through its My AI feature.

**F. Snap Facilitates the Spread of Child Sexual Abuse Material and Child Exploitation**

165. The overuse of Snapchat by children, combined with the lack of parental controls and secrecy elements of Snapchat, create the perfect storm for CSAM.

---

[72] *Staying Safe with My AI*, SNAPCHAT, https://help.snapchat.com/hc/enus/articles/13889139811860-Staying-Safe-with-My-AI (last visited September 2, 2025).

[73] Lynne Kjolso, *Microsoft Advertising partners with Snap to power Sponsored Links within Snapchat's My AI chatbot*, MICROSOFT ADVERT. (Sept. 25, 2023), https://about.ads.microsoft.com/en/blog/post/september-2023/microsoft-advertising-partnerswith-snap-to-power-sponsored-links-within-snapchats-my-ai-chatbot; *Evolving My AI with Sponsored Links powered by Microsoft Advertising*, SNAP NEWSROOM (Sept. 21, 2023) https://newsroom.snap.com/evolving-my-ai-with-sponsored-links-powered-by-microsoftadvertising.

[74] *Id.*

166. Despite being marketed to and designed for children, Snapchat includes a number of features that promote and dramatically exacerbate sexual exploitation, the spread of CSAM, sextortion, and other socially maladaptive behavior that harms children. Snap knows or should have known that its product features are unsafe for children and that it fails to implement reasonable, child-protective safeguards, despite its express representations to the contrary. For example, by failing to age-restrict its Discover feature, Snapchat's algorithm has recommended inappropriate sexual content to adolescent users. By promoting the connection between minors and adults, it is facilitating child exploitation and predation. By failing to implement adequate age restrictions and other parental controls that give parents true control over their children's activity, Snap allows harmful interactions with predators to continue unnoticed.

167. As a direct consequence of the child exploitation that occurs on its platform, Snapchat is tainted by illegal material that promotes and facilitates the continued sexual exploitation of minors. Snap receives value in the form of increased user activity for the dissemination of CSAM on its product.

168. Furthermore, Snapchat's disappearing-content design, while appealing to minors, makes it more difficult for parents to monitor their children's social-media activity. This feature also contributes to a sense of impunity for many users, encouraging and fomenting exploitation and predatory behavior, which has been observed in multiple empirical studies.[75] According to these studies, Snapchat users believe their conduct is hidden and feel empowered to engage in criminal behavior through the product without fear of getting caught.

[75] *Snapchat by the Numbers: Stats, Demographics & Fun Facts*, Omnicore (Mar. 2, 2022), https://www.omnicoreagency.com/snapchat-statistics/.

169. These feelings are promoted by design. Snap intends for the product's disappearing messaging to entice users to share highly personal photos and information that many users would otherwise feel uncomfortable sharing on "higher-stake" apps.[76] In short, this design choice encourages and allows minors to share harmful, illegal, and sexually explicit images while providing predators with a vehicle to recruit victims. Studies have also found that the "close ties" generated between teenagers on Snapchat foster the conditions for grooming and other predatory behavior.

170. As a result, Snapchat is one of the go-to products for sexual predators.[77]

171. In 2014, Snap introduced "Snapcash," a peer-to-peer mobile payment service. Snapcash provided a way for users to pay for private content with little to no oversight.[78] Snapcash enabled CSAM and other sexual exploitation, as users were paid with Snapcash to send, receive, create, publish, save, accept, or otherwise participate in CSAM. It also enabled predators to extort cash from adolescent users by threatening to disseminate CSAM to other users.

172. Snapcash was abruptly removed from Snapchat in 2018 as users were sending sexually explicit photos and using Snapcash for payment.[79]

---

[76] See Evelyn Lopez et al., *The Gratifications of Ephemeral Marketing Content, the Use of Snapchat by the Millenial Generation and Their Impact on Purchase Motivation*, Global Bus. Rev. (2021), https://journals.sagepub.com/doi/pdf/10.1177/09721509211005676.

[77] *See, e.g.*, Rebecca Woods, *What Are The Dangers Of Snapchat To Avoid?*, PhoneSpector (June 16, 2021), https://phonespector.com/blog/what-are-the-dangers-of-snapchat-to-avoid/.

[78] Kurt Wagner, *Snapchat to Let You Send Money to Friends, Thanks to Square*, Vox, https://www.vox.com/2014/11/17/11632930/snapchat-to-let-you-send-money-to-friends-thanks-to-square.

[79] Christian Hargrave, *Snapcash Goes Away After Excessive Feature Misuse*. App Developer Magazine (July 25, 2018), https://appdevelopermagazine.com/snapcash-goes-away-after-excessive-feature-misuse/.

173. Snapchat also allows users to voice or video call one another in the app.[80] This feature is dangerous in that it allows sexual predators to call and video chat with minors in private, with virtually no evidence of what was exchanged. Sexual predators use this function to identify children willing to add and speak with a stranger and then prey on the child's vulnerabilities.

174. Collectively, these product features promulgate communication and conduct with a false sense of intimacy between users and encourage predators to use Snapchat to target children for grooming, sexual exploitation, sextortion, and CSAM.

175. The issues with social media companies like Snap and child sexual exploitation has become so concerning that in November 2019, a bipartisan group of Senators sent a letter to leading tech companies, including Snapchat. The letter sought answers about the online sexual grooming of children and CSAM detection technologies.[81]

176. The following year, ParentsTogether, a national parent group, delivered a petition from 100,000 parents to Snap demanding that the company do more to "protect children from sexual abuse and exploitation" on Snapchat.[82]

177. The petition listed numerous examples of widespread online sexual grooming of children, including: a high school coach who used Snapchat to extort sexual videos from several girls as young as fourteen; a man who posed as a therapist and blackmailed a thirteen-year-old girl

[80] Snapchat Support, *How to Start a Video Chat on Snapchat*, https://support.snapchat.com/en-GB/a/videochat#:~:text=You%20can%20Video%20Chat%20with,into%20a%20full%2Dscreen%20Chat.

[81] *Letter to Sundar Pichai and 36 other Tech Companies by Senate Committee* (Nov. 18, 2019),https://www.blumenthal.senate.gov/imo/media/doc/11.18.19%20-%20Google%20-%20CSAM.pdf.

[82] *Snapchat: Prevent Pedophiles from Sharing Abuse Videos*, https://parentstogether.org/snapchat-petition

into sending him sexual videos and photos; and a man who was arrested for running a sextortion ring on Snapchat, coercing children into sending sexually explicit material.[83]

178. In response, Snap announced that by Fall of 2020, it would deploy technology in addition to Microsoft's PhotoDNA to help stop the spread of CSAM through its product.

179. By failing to utilize these technologies until late 2020, Snap harmed adolescent users as its product contributed to child exploitation, sextortion, and the spread of CSAM.

180. In addition, while Snapchat allows users to report harmful images or videos, they cannot specifically report CSAM that is sent to a user via direct messaging, including from another user's camera roll.

181. Snapchat's disappearing messages cannot be reported at all.

182. While Snap states that it is using technology to identify *known* illegal images and videos of CSAM and report them to NCMEC, it does not address how Snapchat's design contributes to the ongoing proliferation of CSAM materials and the sexual exploitation of its adolescent users, nor does it warn users of these problems.

183. The proclivity to use Snapchat for inappropriate and deviant sexual activities was apparent from the start of the platform. Because of its brand identity among millennials as the original ephemeral-messaging app, Snapchat almost immediately became known as the "sexting" app – a fact that Snap would have known from public sources.[84]

184. Snapchat also became the predominant forum for "sextortion," whereby predators solicit and capture sexually explicit images of users, including children and adolescents lulled into

---

[83] *Id.*

[84] Megan Dickey, *Let's Be Real: Snapchat Is Totally Used For Sexting,* Bus. Insider (Nov. 30, 2012) https://www.businessinsider.com/snapchat-growth-sexting-2012-11

a false sense of security by Snap's promises that images will disappear, and then extort senders to send money to avoid distribution of the Snap to friends and family. Especially because teenagers are already anxious about their social image, parents and law enforcement report numerous children driven to suicide by the shame and fear of sexually explicit Snaps.[85]

185. Financial sextortion is one of the most rapidly growing crimes targeting American youth.[86] In January 2024, the Network Contagion Research Institute (NCRI) published its Threat Intelligence Report which warned of an "exponential increase" in sextortion cases targeting minors and youth on social media platforms over the past 18 months. During this period, the FBI reported a 1,000% increase in financial sextortion incidents, while NCMEC reported a 7,200% increase in financial sextortion targeting children from 2021-2022.

186. The NCRI report describes Snapchat as "most frequently utilized to coerce victims into sending" sexually explicit photos, noting that "Snapchat is the preferred app by criminals because its design features provide a false sense of security to the victim that their photos will disappear and not be screenshotted.[87]

187. The NCRI findings revealed Snap's platform is used by a West African cybercriminal group called the "Yahoo Boys," who use "fake social media accounts to coerce victims, almost all of them boys, into sharing an explicit photo," which they then use to "threaten

---

[85] Rachel Hale, *These Teenage Boys Were Blackmailed Online and It Cost Them Their Lives* (April 22, 2025) https://www.usatoday.com/story/life/health-wellness/2025/02/25/teenage-boys-mental-health-suicide-sextortion-scams/78258882007/.

[86] *A Digital Pandemic: Uncovering the Role of "Yahoo Boys" in the Surge of Social Media-Enabled Financial Sextortion Targeting Minors*, NCRI, Paul Raffile, et al. (Jan. 2024).

[87] *Id.*

to (and sometimes do) expose the photo to victim's friends, family and followers unless a ransom is paid."[88]

188. These sextortion criminals can easily bypass Snap's inadequate safety measures, which promise to notify users after a screenshot has been taken of their Snaps or when a prerecorded video or image is used (another sign of scammers). This allows sextortion victims to falsely believe their images have not been saved by predators.

189. Despite receiving numerous reports regarding how its product's features contribute to child exploitation, Snap has elected to keep many of these features in place.[89] It has done so because removing them would significantly diminish Snapchat's popularity and negatively impact profits.

190. Notwithstanding these glaring flaws, Snap advertises and promotes its product as safe and fun. Snap's Vice President of Global Public Policy, Jennifer Stout, stated in written testimony to a Senate Subcommittee that Snap takes "into account the unique sensitivities and considerations of minors when we design products"[90] when, in fact, Snap intentionally designed its product to promote compulsive and excessive use and help underage users conceal information from their parents.

---

[88] *Id.* at 6

[89] See, e.g., Zak Doffman, Snapchat Has Become A 'Haven For Child Abuse' With its "Self-Destructing Messages', Forbes (May 26, 2019), https://www.forbes.com/sites/zakdoffman/2019/05/26/snapchats-self-destructing-messages-have-created-a-haven-for-child-abuse/?sh=411b8e1d399a.

[90] Snap's Senate Congressional Testimony - Our Approach to Safety, Privacy and Wellbeing, https://values.snap.com/news/senate-congressional-testimony-our-approach-to-safety-privacy-and-wellbeing.

191. Ms. Stout claimed that Snap makes it harder for strangers to find minors when, in fact, Snapchat's "Quick Add" feature is responsible for introducing minors to complete strangers, and its "Snap Map" feature has enabled threats, exploitation, and location of minors by complete strangers.

192. Likewise, Snap's Head of Global Platform Safety, Jacqueline Beauchere, represented to the public that "Snapchat is designed for communications between and among real friends; it doesn't facilitate connections with unfamiliar people like some social media platforms."[91] As described herein, this is not true.

193. In addition, Snap knows or should have known, that its products facilitate and encourage the production, possession, distribution, receipt, transportation, and dissemination of millions of materials that exploit children and violate child pornography laws. Snap further knows, or should have known, that its product facilitates the production, possession, distribution, receipt, transportation, and dissemination of materials that depict obscene visual representations of the sexual abuse of children.

**G. Snap Failed to Adequately Warn About the Dangers of Its Product**

194. Since Snap's inception, it has failed to warn adolescent users about its products' physical and mental health risks. These risks include, but are not limited to, addiction, compulsive and excessive use, sexual exploitation by adult users, dissociative behavior, social isolation, and an array of mental health disorders like body dysmorphia, anxiety, depression, and insomnia.

195. Snap targets adolescent users via advertising and marketing materials distributed via digital and traditional media, including expensive advertisements placed during high-profile

[91] *Snap's Meet Our Head of Global Platform Safety*, https://values.snap.com/news/meet-ourhead-of-global-platform-safety.

sporting events. Snap fails to warn the targets of these ads—often minors—about the physical and mental risks associated with using Snapchat.

196. Snap further fails to warn adolescent users during the product registration process.

197. At account setup, Snap's product contains no warning labels, banners, or conspicuous messaging to adequately inform adolescent users of the known risks and potential physical and mental harms associated with usage of its product. Instead, Snap allows adolescent users to easily create an account (or multiple accounts) and fully access the product.

198. Snap's lack of adequate warnings continues after an adolescent has the Snapchat product. Snap does not adequately inform adolescent users that their data will be tracked, used to help build a unique algorithmic profile, and potentially sold to Snap's advertising clients, who will in turn use the data to target and profile the user.

199. Alarmingly, Snap also does not warn adolescent users before facilitating adult connections and interactions that adult predators use its product. It also fails to instruct adolescent users on ways to avoid unknown adults on Snap.

200. Snap also fails to warn adolescent users who exhibit problematic signs of addiction or are habitually and compulsively accessing the app. Instead, Snap utilizes push notifications to encourage engagement with Snapchat.

201. In addition, despite proactively providing adolescent users with countless filtering and editing tools, Snap does not warn its adolescent users regarding the mental health harms associated with those heavily filtered images.

202. Snap also does not warn users that adult predators target children and teenagers for sexual exploitation, sextortion, and CSAM on Snap's product; that usage of its product can increase the risk of children being targeted and sexually exploited by adult predators; that usage of its product can increase risky and uninhibited behavior in children, making them easier targets for

sexual exploitation, sextortion, and CSAM by adult predators; or that end-to-end encryption and/or ephemeral nature of Snap's direct messaging product prevents the reporting of CSAM.

203. Snap also fails to warn parents about all of the foregoing dangers and harms.

204. Snap's failure to properly warn and instruct adolescent users and parents has proximately caused significant harm to citizens of the State of Arkansas's mental and physical well-being, and other injuries and harms as set forth herein.

### H. Snap Has Forced the State of Arkansas to Spend Significant Resources to Combat Youth and Adolescent Mental Health Issues

205. Snapchat has created a mental health crisis in Arkansas. As a result, Arkansas has substantially increased funding for (i) outpatient mental health services for children and teens, (ii) family based mental health services, (iii) mobile crisis teams with a 24-hour call center, (iv) telehealth training for first responders, (v) emergency services, (vi) dedicated suicide prevention efforts for youth, (vii) evidence-based programs for school-aged youth, (viii) peer support services, and (ix) family support services. Furthermore, the Arkansas Division of Education website hosts a social-media awareness campaign for teachers, parents, and students.[92] and the State Attorney General's website hosts additional internet-safety resources on social-media sites, including Snapchat.[93]

206. In 2021, the Arkansas General Assembly passed a bill that required a study on mental and behavioral health that would address the suicide rate among school-aged children in the State, provide children with mental health screenings, and institute suicide prevention

---

[92] SMACtalk, *Social Media Awareness Campaign*, Ark. Div. of Elementary and Secondary Educ., https://dese.ade.arkansas.gov/Offices/research-and-technology/smactalk.

[93] *Education Programs, Internet* Safety, Office of the Att'y Gen.,https://arkansasag.gov/divisions/community-relations/education-programs/presentations-and-publications/internet-safety/.

measures.[94] The study revealed that Arkansas Children's Hospital reported seeing a large increase in mental health and behavioral health cases since 2020.[95] The Arkansas Chapter of the American Academy of Pediatrics testified that many pediatricians in the State struggle to find access to proper care for their patients.[96]

207. In response to the study, Arkansas announced four new pilot programs designed to better serve children with behavioral and other issues at a cost of $200 million.

208. One pilot program will restrict mobile devices in schools by providing students with pouches where they can store phones during the school day. The program will also expand mental health services for students, parents, and teachers via telehealth to connect families, students, and school employees to mental and behavioral healthcare, substance abuse care, social services, and to navigate matters involving insurance.[97]

209. Despite these State-funded programs and services, Arkansas service providers are struggling to provide enough mental health programs because of the increase in youth seeking these services. Children and adolescents cannot access services in a timely manner due to long wait lists for existing mental health care providers.

---

[94] *Arkansas Legislative Study on Mental and Behavioral Health*, Ark. Gen. Assembly (Nov. 15, 2022) (*Arkansas Legislative Study*) https://arkleg.state.ar.us/Home/FTPDocument?path=%2FAssembly%2FMeeting+Attachments%2F000%2F25193%2FExhibit+G.01(a)+-+Public+Health+ALC+-+Mental+and+Behavioral+Health+Report.pdf.

[95] *Id.*

[96] *Id.*

[97] *Sanders Invites Arkansas School Districts to Join Phone-Free School, Mental Health Pilot Program,* https://governor.arkansas.gov/news_post/sanders-invites-arkansas-school-districts-to-join-phone-free-school-mental-health-pilot-program-2/.

210. Young users generate a trove of data about their preferences, habits, and behaviors. That information is Snap's most valuable commodity. Snap mines and commodifies that data, such as by selling to advertisers the ability to reach incredibly narrow tranches of the population, including adolescents and children. Snap placed its app into the stream of commerce and generated revenues through the distribution of those apps at the expense of the consuming public and the State of Arkansas.

## CAUSES OF ACTION

211. The claims made herein arise from Snap's status as a designer and marketer of a dangerous social media platform that has injured the health, comfort, and repose of the youth of the State of Arkansas. The nature of Snap's platform centers around Snap's use of algorithms and other design features that encourage users to spend the maximum amount of time on their platforms despite knowing the harm it causes to its child and adolescent users.

212. The State expressly disavows any claims or allegations that attempt to hold Snap liable as the publisher or speaker of any information provided by third parties within the plain meaning of the Communications Decency Act and as interpreted by applicable law. The State's allegations center on the harm caused by Snap's conduct in designing features meant to addict users and exploit their vulnerabilities.

213. Snap is also liable for the content it creates and pushes on its social media site. As explained herein, Snap creates original content that it pushes on youth and adolescent users through its recommendation algorithm, including harmful content.

214. In addition, Snap continues to send emails and push notifications to youth and adolescent users which include material it creates and often promotes or amplifies harmful content through its various features and reward tools such as Snap Streaks, Snap Scores and emojis.

215. The State's claims are predicated on Snap's conduct, which has fueled the current youth mental health crisis in Arkansas as well as Snap's misrepresentations through its statements and omissions that its platform is safe for youth.

## COUNT I

### Arkansas Public Nuisance Law

216. The State incorporates each preceding paragraph as though set forth fully herein.

217. The State brings this claim as the State in a *parens patriae* capacity, for the benefit of the people it serves, for the protection of their health, welfare, and prosperity, under Arkansas public nuisance law.

218. Snap has created a mental health crisis in Arkansas's communities, injuring the public's health and safety and interfering with the operations, use, and enjoyment of the life and/or the free use of property of entire communities or neighborhoods. This condition affects a considerable and substantial number of persons within the State.

219. Snap knew, or had reason to know, that use of its platforms and the addictive features contained therein would lead to mental and behavioral health problems for users, including but not limited to addiction, increased rates of depression, isolation, eating disorders, cyberbullying, negative self-image, harmful upward comparisons among vulnerable young users, and increased prevalence of suicidal thoughts and attempts among those users.

220. Citizens within the State, including the youth, have a right to be free from conduct that endangers their health and safety. However, Snap has engaged in conduct that endangers or injures the health and safety of Arkansans by designing, marketing, and operating its social media platform and targeting youth in the State's communities in a manner that substantially interferes

with the functions of the State's operations and impacts the public health, safety, and welfare of the citizens in the State.

221. A public nuisance is one that interferes with public health and welfare and creates an imminent risk of public harm.

222. Snap has created and maintained a public nuisance that proximately caused injury to the State.

223. Snap had control over its conduct in Arkansas, and that conduct had an adverse effect on the public rights detailed herein. Snap had sufficient control over, and responsibility for, the public nuisance they created – Snap was in control of the "instrumentality" of the nuisance, namely the operation of their social media platforms, at all relevant times.

224. As described herein, Snap has intentionally and unlawfully engaged in conduct that endangers or injures the health and safety of Arkansas's residents by designing, marketing, and operating its social media platform and targeting Arkansas youth in a manner that substantially interferes with the functions and operations of the State and impacts the public health, safety and welfare of the public in Arkansas.

225. This harm to youth mental health and the corresponding impacts to the public health, safety, and welfare of the State's communities outweighs any social utility of Snap's wrongful conduct.

226. The rights, interests, and inconvenience to Arkansas's residents far outweigh the rights, interests, and inconvenience to Snap, who has profited tremendously from its wrongful conduct.

227. Snap knows, and has known, that it caused youth to become addicted to its social media platform, harming youth mental health.

228. Snap directly facilitated the widespread, excessive, and habitual use of its platform and the public nuisance affecting Arkansas.

229. Snap owed the public a duty to exercise reasonable and ordinary care and skill in accordance with the applicable standards of conduct in designing, marketing, and operating a platform directed to youth and adolescents.

230.. Snap breached its duty to exercise the appropriate degree of care commensurate with designing, marketing, and operating its platform directed to youth.

231. Snap's conduct is especially injurious to the State because the State and its residents have sustained and will continue to sustain substantial injuries.

232. Snap is liable for creating the public nuisance because the intentional, unreasonable, negligent, and unlawful conduct of Snap was a substantial factor in producing the public nuisance and harm to the State.

233. The nuisance created by Snap's conduct is abatable.

234. The State has expended substantial resources and has had to mitigate the harm and disruption caused by Snap's deceptive and unconscionable practices and will require much more to fully abate the harm.

235. Alternatively, Snap's conduct was a substantial factor in bringing about the public nuisance even if a similar result would have occurred without it. By designing, marketing, promoting, and operating their platforms in a manner intended to maximize the time youth spend on their respective platforms, despite knowledge of the harms to youth from their wrongful conduct, Snap directly facilitated the widespread, excessive, and habitual use of its platform and the public nuisance affecting the State.

236. By seeking to capitalize on its success by refining its platform to increase the time youth spend on its platform, Snap directly contributed to the public health crisis and the public nuisance affecting the State and its citizens.

237. Snap's conduct is of a continuing nature and has produced a permanent or long-lasting effect, and, as Snap knows or has reason to know, has a significant effect upon the enjoyment of rights held in common by the public.

238. The State has incurred expenditures and has had to take steps to mitigate the harm and disruption caused by Snap's conduct, including allocating funding for the following:

(a) additional mental health personnel to focus on youth mental health;

(b) additional mental health resources including mental health programs for youth, family-based mental health services, crisis prevention programs for youth, outpatient mental health programs, mobile crisis programs, emergency services specifically for youth mental health emergencies, peer support services, family support services, and partial hospitalization programs for youth;

(c) trainings for mental health workers, social workers, school staff, and other personnel to help youth with their mental health, including assessment and diagnosis tools, suicide prevention approaches, trauma-informed care strategies, and certified peer support programs for young adults;

(d) production and distribution of educational materials on social, emotional, and mental health for youth, including suicide prevention materials;

(e) coordination and delivery of mental health care services to public schools within the State, including offering assessments, group therapy, individual counseling, and suicide prevention efforts;

(f) supporting families and caretakers of youth with mental health diagnoses including through funding of family-based partial hospitalization programs, mental health trainings, trauma-informed care trainings, caregiving coaching, and support groups;

(g) increasing intervention services and hiring additional personnel to address property damaged as a result of youth acting out because of mental, social, and emotional problems caused by Defendant's conduct; and

(h) investigating and responding to threats made over social media.

239. The State also seeks damages as a result of the public nuisance that Snap has created, or of which Snap has assisted in the creation, and all other relief available under the ADTPA in an action brought by the State in a *parens patriae* capacity.

## COUNT II

### Violation of Arkansas's Deceptive Trade Practices Act (§ 4-88-101, *et. seq.*)

240. The State incorporates each preceding paragraph as though set forth fully herein.

241. Pursuant to Ark. Code Ann. § 4-88-104, the Attorney General brings this action for civil enforcement of the provisions of the ADTPA seeking restitution and an injunction against the Snap to cease the deceptive trade practices in which it has been engaged.

242. Snap knowingly and actively designed its products to be addictive to young users regardless of the harm that the platform caused to them.

243. Despite having internal research detailing the addictive nature of the features being developed and implemented into Snap's product, Snap led users and parents of young users to believe its social media platform was safe for use by young people.

244. Snap made these statements and crafted this image despite its own collection, research, and algorithm-based information showing that Arkansas youth are compulsively using Snapchat and that such overuse harms youth.

245. Despite knowledge of the risks posed by use of its product, Snap targeted the young users most vulnerable and likely to be affected by the harmful aspects of its product because of the potential profit Snap sought to gain by capturing more of the child, tween, and teen markets.

246. Snap did not adequately inform users, potential users, and parents of users of the data and research known to Snap about the dangers posed by use of its product. Snap actively concealed, omitted, and suppressed these material facts with the intent that users rely upon its concealment, omission, and suppression to continue to add users, specifically youth users, in callous and reckless disregard for the known physical and mental health problems being created for those individuals who were using and continue to use Snapchat. Snap further misled and deceived the public about the addictive, destructive, and harmful effects its product had and has on youth users.

247. As described throughout this Complaint, Snap's deceptive and unconscionable trade practices include knowingly making false representations as to the characteristics – specifically the safety and addictiveness – of Snap's services and platforms in violation of Ark. Code Ann. §4-88-107(a)(1).

248. Through Snap's unconscionable and deceptive trade practice of deceiving users and potential users about the truth of the safety and addictiveness of its services, Snap knowingly took advantage of vulnerable children and adolescent users who were reasonably unable to protect their own interests because of their young age. Children and adolescent users and their parents are ignorant of the facts Snap has in its possession and control, and they are unable to understand the

addictive and harmful consequences of using Snap's product, which conduct constitutes a violation of Ark. Code Ann. § 4-88-107(a)(8).

249. Snap uses deception, false pretense, and the concealment, suppression, and omission of material facts regarding the safety and addictiveness of its product and the features permeating its product with intent that others rely upon the concealment, suppression, or omission of those material facts in order to increase the sale of advertisements on its products in violation of Ark. Code Ann. § 4-88-108(a)(1)-(2).

250. Snap concealed, omitted, and suppressed material facts with the intent that others rely upon the concealment, omission, and suppression in order to maintain users, gain additional users, and likewise increase users' screen time and increase frequency of engagement with its products to facilitate the sale and delivery of targeted advertising to users to increase its profits in violation of Ark. Code Ann.§4-88-108 (a)(2).

251. Snap undertook deceptive and unconscionable practices in furtherance of its business, commerce, or trade and to profit at the cost of the decimated mental health of youth users in violation of Ark. Code Ann. § 4-88-107(a)(10).

252. The false representations, fraud, concealments, omissions, and suppressions of damaging information were deceptive and constituted a repeated course of unconscionable conduct contrary to public policy and the public's interest that continues to this day.

253. The addictive and harmful qualities of Snap's product and the algorithms used to foster that addiction are not fully known or understood by minor users or their parents.

254. Pursuant to Ark. Code Ann. § 4-88-113, the State seeks a declaratory judgment that Snap violated the ADTPA, an injunction enjoining the Snap's false representations, omissions, concealments, and suppressions described throughout this Complaint, civil penalties of $10,000

per violation, costs, attorneys' fees, and all other relief available under the ADTPA in an action brought by the State in a *parens patriae* capacity.

## COUNT III

### Unjust Enrichment

255. The State incorporates each preceding paragraph as though set forth fully herein.

256. Under Arkansas law, unjust enrichment occurs when a party has received something of value to which he or she is not entitled by some operative act, intent, or situation to make the enrichment unjust and compensable.

257. Unjust enrichment can be found when a person has received money or its equivalent under such circumstances that in equity and good conscience he or she ought not to retain.

258. Snap received a benefit at the expense of Arkansas citizens in the form of advertising revenue and subscription revenue derived from time spent on Snap's social media platform.

259. Snap designed its social media platform to be addictive in nature, thereby monetizing the screen time of Arkansas's citizens and causing harm. Accordingly, the citizens of Arkansas conferred a financial benefit on Snap but did not receive the expected benefit therefrom.

260. The addictive features and false representations, concealment, omission, and suppression of facts detailed throughout this Complaint were used to generate this ad and subscription revenue at the expense of unwary and vulnerable users who were not informed of the harms and dangers associated with the use of Snap's products and features.

261. Through its use of the deceptive, unlawful, and unconscionable practices detailed throughout this Complaint, Snap readily accepted and retained these benefits at the expense of the

citizens of Arkansas and knowingly benefitted from their unjust conduct and were unjustly enriched.

262. It is unjust and inequitable for Snap to retain these benefits because they were attained by falsely representing, suppressing, and concealing the true nature of its social media platforms from the State's citizens, who would not have spent excessive time on Snap's platform, but for Snap's deception, false representations, manipulations, and concealment.

263. Equity cannot in good conscience permit Snap to retain the benefits derived from the State and at the expense of the health and safety of Arkansas citizens through its unjust and unlawful acts, and therefore restitution or disgorgement of the amount of its unjust enrichment is required.

264. There is no valid, legal, and binding contract governing this dispute.

265. The State, therefore, seeks restitution of the sum, to be determined at trial, by which Snap has been unjustly enriched.

## JURY DEMAND

266. The State demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, the State prays for judgment as follows:

A. Declaring that the conduct alleged herein constitutes a public nuisance under Arkansas law;

B. Requiring Defendant to abate the public nuisance described herein and to deter and prevent the resumption of such nuisance;

C. Enjoining Defendant and any agents, successors, assigns, and employees acting directly or through any corporate or business device from engaging in further actions causing or contributing to the public nuisance as described herein;

D. Declaring that Defendant violated the ADTPA;

E. Enjoining Defendant and any agents, successors, assigns, and employees acting directly or through any corporate or business device, from engaging in acts and practices alleged in this Complaint and any other acts and practices that violate the ADTPA;

F. Directing Defendant to disgorge and forfeit all profits it has derived as a result of its unfair and deceptive acts and practices;

G. Awarding equitable relief to fund prevention education and treatment for excessive and problematic use of social media;

H. Awarding actual and compensatory damages;

I. Awarding the maximum statutory damages;

J. Awarding reasonable attorneys" fees and costs;

K. Awarding pre-judgment and post-judgment interest; and

L. Granting further just and proper relief.

DATED: June 23, 2026

Respectfully submitted,

REDDICK LAW, PLLC
BRIAN REDDICK
MATTHEW SWINDLE
HEATHER ZACHARY
One Information Way, Suite 105
Little Rock, AR 72202
Telephone: 501/943-1456
501/907-7793 (fax)
brian@reddicklawfirm.com
matthew@reddicklawfirm.com
hzachary@reddicklawfirm.com

THE LANIER LAW FIRM
W. MARK LANIER
ALEX J. BROWN
ZEKE DeROSE III
10940 West Sam Houston Parkway North, Suite 100
Houston, TX 77064
Telephone: 713-659-5200
713/659-2204 (fax)
mark.lanier@lanierlawfirm.com
alex.brown@lanierlawfirm.com
zeke.derose@lanierlawfirm.com

*Attorneys for the State of Arkansas*

THE CIRCUIT COURT OF PHILLIPS COUNTY, ARKANSAS

________ DIVISION [Civil, Probate, etc.]

STATE OF ARKANSAS, ex rel.
TIM GRIFFIN, ATTORNEY GENERAL
Plaintiff

v. No. 54CV-26-251

SNAP INC.
Defendant

SUMMONS

**THE STATE OF ARKANSAS TO DEFENDANT:**

SNAP INC.
Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

[Defendant's name and address.]

A lawsuit has been filed against you. The relief demanded is stated in the attached complaint. Within 30 days after service of this summons on you (not counting the day you received it) — or 60 days if you are incarcerated in any jail, penitentiary, or other correctional facility in Arkansas — you must file with the clerk of this court a written answer to the complaint or a motion under Rule 12 of the Arkansas Rules of Civil Procedure.

The answer or motion must also be served on the plaintiff or plaintiff's attorney, whose

name and address are: Reddick Law, P.A.
Brian Reddick
Matthew Swindle
Heather Zachary
One Information Way, Suite 105
Little Rock, AR 72202

If you fail to respond within the applicable time period, judgment by default may be entered against you for the relief demanded in the complaint.

**Additional Notices Included:** ______________________________________

____________________________________________________________

____________________________________________________________

CLERK OF COURT

Address of Clerk's Office

__________________ ____________________________

[Signature of Clerk or Deputy Clerk]

__________________ Date:____________________________

[SEAL]

**No. __________ This summons is for ____________________ (*name of Defendant*).**

**PROOF OF SERVICE**

☐ On ________________ [date] I personally delivered the summons and complaint to the defendant at ________________________________________ [place]; or

☐ After making my purpose to deliver the summons and complaint clear, on ___________________ [date] I left the summons and complaint in the close proximity of the defendant by _______________________________________ [describe how the summons and complaint was left] after he/she refused to receive it when I offered it to him/her; or

☐ On ________________ [date] I left the summons and complaint with ______________________, a member of the defendant's family at least 18 years of age, at _________________________________ [address], a place where the defendant resides; or

☐ On ____________ [date] I delivered the summons and complaint to ______________ [name of individual], an agent authorized by appointment or by law to receive service of summons on behalf of ___________________________________ [name of defendant]; or

☐ On __________________ [date] at _________________________________ [address], where the defendant maintains an office or other fixed location for the conduct of business, during normal working hours I left the summons and complaint with ________________________________________________[name and job description]; or

☐ I am the plaintiff or an attorney of record for the plaintiff in a lawsuit, and I served the summons and complaint on the defendant by certified mail, return receipt requested, restricted delivery, as shown by the attached signed return receipt.

☐ I am the plaintiff or attorney of record for the plaintiff in this lawsuit, and I mailed a copy of the summons and complaint by first-class mail to the defendant together with two copies of a notice and acknowledgment and received the attached notice and acknowledgment form within twenty days after the date of mailing.

☐ Other [specify]:

☐ I was unable to execute service because:

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

My fee is $ __________.

**To be completed if service is by a sheriff or deputy sheriff:**

Date: ___________ SHERIFF OF ____________________ COUNTY, ARKANSAS

By: ____________________________________________
[signature of server]

______________________________________________________________
[printed name, title, and badge number]

**To be completed if service is by a person other than a sheriff or deputy sheriff:**

Date: _________________________

By: ____________________________________________
[signature of server]

________________________________________________
[printed name]

Address: ________________________________________

________________________________________

Phone: __________________________________

Subscribed and sworn to before me this date: _______________________

Notary Public ___________________________________

My Commission Expires: _________________________________

Additional information regarding service or attempted service:

________________________________________________

________________________________________________

## Form of Summons

The Supreme Court of Arkansas has adopted the following form of summons for use in all cases in which personal service is pursuant to Rule 4(c), (f), and (h) of the Arkansas Rules of Civil Procedure. The form incorporates a proof of service to be made by a sheriff, deputy sheriff, or other person, as appropriate, in accordance with Rule 4(g).

The form may be modified as needed in special circumstances, and additional notices, if required, should be inserted as appropriate. Examples include the notices required by statute in unlawful-detainer and replevin actions, *see* Ark. Code Ann. §§ 18-60-307(a) and 18-60-808(a), and the notice of the consent jurisdiction of a state district court that must be included pursuant to Ark. Sup. Ct. Admin. Order No. 18(6)(d)(1).

This form is not for use in cases of constructive service pursuant to Rule 4(g)(3). The adoption of this form is in compliance with Rule 4(b) and does not modify or amend any part of that rule.

Effective July 1, 2012
Corrected August 14, 2012
Revised Effective January 1, 2019

**Case Title:** STATE OF ARKANSAS EX REL ET AL V SNAP INC

**Case Number:** 54CV-26-251

**Type:** SUMMONS - FILER PREPARED

So Ordered

Tamekia L. Franklin, Phillips Circuit Clerk

ELECTRONICALLY FILED
Phillips County Circuit Court
Tamekia L. Franklin, Circuit Clerk
2026-Jul-01 17:29:42
54CV-26-251
C01D01 : 13 Pages

**IN THE CIRCUIT COURT OF PHILLIPS COUNTY, ARKANSAS**
**CIVIL DIVISION**

STATE OF ARKANSAS, ex rel.
TIM GRIFFIN, ATTORNEY GENERAL — PLAINTIFF

vs. CASE NO. 54CV-26-251

SNAP INC. — DEFENDANT

## AFFIDAVIT OF SERVICE

STATE OF ARKANSAS )
) ss
COUNTY OF PULASKI )

The undersigned attorney, having been duly sworn, states upon oath and affirmation as follows:

1. That I am an attorney for the Plaintiff in the above captioned case.

2. That on June 23, 2026, I caused a copy of the Summons and Complaint to be served on Corporation Service Company, registered agent for Snap Inc., via process server.

3. That said Summons and Complaint were served on June 23, 2026, by process server as evidenced by the Proof of Service, which is attached hereto as Plaintiff's Exhibit "A".

IN WITNESS WHEREOF, I have set my hand this 1st day of July 2026.

Respectfully submitted,

Brian D. Reddick (94057)
*brian@reddicklawfirm.com*
Matthew D. Swindle (2012168)
*matthew@reddicklawfirm.com*
Heather G. Zachary (2004216)
*hzachary@reddicklawfirm.com*
**Reddick Law Firm, P.A.**
One Information Way, Suite 105
Little Rock, AR 72202
Telephone: (501) 907-7790

W. Mark Lanier
*mark.lanier@lanierlawfirm.com*
Alex J. Brown
*alex.brown@lanierlawfirm.com*
Zeke DeRose III
*zeke.derose@lanierlawfirm.com*
**The Lanier Law Firm**
10940 West Sam Houston Pkwy N., Suite 100
Houston, TX 77064
Telephone: (713) 659-5200
Facsimile: (713) 659-2204

*Attorneys for the State of Arkansas*

## ACKNOWLEDGEMENT

On this 1st day of July 2026, before me, a Notary Public in and for the State and County aforesaid, came the individual known to me to be the person whose name is subscribed to the above and foregoing Affidavit of Service, and acknowledged that they executed the same for purposed therein contained.

In witness whereof, I hereunto set my hand and official seal.

Notary Public

My Commission Expires:
4/7/31

JENNIFER MCGUIRT
NOTARY PUBLIC
SALINE COUNTY, ARKANSAS
COMM. EXP. 04/07/31
COMMISSION NO. 12713996

**CERTIFICATE OF SERVICE**

I hereby certify that on this the 1st day of July 2026, I electronically filed the foregoing via eFlex, which shall send notification to the attorneys registered in this case to receive such filings.

*/s/ Jennifer McGuirt*
Reddick Law Firm, P.A.

# EXHIBIT

# A

THE CIRCUIT COURT OF PHILLIPS COUNTY, ARKANSAS

________ DIVISION [Civil, Probate, etc.]

STATE OF ARKANSAS, ex rel.
TIM GRIFFIN, ATTORNEY GENERAL
Plaintiff

v. No. 54CV-26-251

SNAP INC.
Defendant

SUMMONS

**THE STATE OF ARKANSAS TO DEFENDANT:**

SNAP INC.
Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

[Defendant's name and address.]

A lawsuit has been filed against you. The relief demanded is stated in the attached complaint. Within 30 days after service of this summons on you (not counting the day you received it) — or 60 days if you are incarcerated in any jail, penitentiary, or other correctional facility in Arkansas — you must file with the clerk of this court a written answer to the complaint or a motion under Rule 12 of the Arkansas Rules of Civil Procedure.

The answer or motion must also be served on the plaintiff or plaintiff's attorney, whose

name and address are: Reddick Law, P.A.
Brian Reddick
Matthew Swindle
Heather Zachary
One Information Way, Suite 105
Little Rock, AR 72202

If you fail to respond within the applicable time period, judgment by default may be entered against you for the relief demanded in the complaint.

**Additional Notices Included:** ______________________________

______________________________

______________________________

CLERK OF COURT

Address of Clerk's Office

______________________ ______________________

[Signature of Clerk or Deputy Clerk]

______________________ Date:______________________

[SEAL]

**No.** 54cv-26-251 **This summons is for** SNAP INC. ***(name of Defendant).***

**PROOF OF SERVICE**

☐ On ________________ [date] I personally delivered the summons and complaint to the defendant at ______________________________________ [place]; or

☐ After making my purpose to deliver the summons and complaint clear, on ___________________ [date] I left the summons and complaint in the close proximity of the defendant by ______________________________________ [describe how the summons and complaint was left] after he/she refused to receive it when I offered it to him/her; or

☐ On ________________ [date] I left the summons and complaint with ______________________, a member of the defendant's family at least 18 years of age, at ________________________________ [address], a place where the defendant resides; or

☒ On 06/23/2026 AT 3:05 PM [date] I delivered the summons and complaint to MS. DENISE (MANAGING AGENT EMPLOYED AT REGISTERED AGENT) [name of individual], an agent authorized by appointment or by law to receive service of summons on behalf of SNAP INC. c/o CORPORATION SERVICE COMPANY, AS AGENT, [name of defendant]; or

☐ On __________________ [date] at ________________________________ [address], where the defendant maintains an office or other fixed location for the conduct of business, during normal working hours I left the summons and complaint with ______________________________________________[name and job description]; or

☐ I am the plaintiff or an attorney of record for the plaintiff in a lawsuit, and I served the summons and complaint on the defendant by certified mail, return receipt requested, restricted delivery, as shown by the attached signed return receipt.

☐ I am the plaintiff or attorney of record for the plaintiff in this lawsuit, and I mailed a copy of the summons and complaint by first-class mail to the defendant together with two copies of a notice and acknowledgment and received the attached notice and acknowledgment form within twenty days after the date of mailing.

☐ Other [specify]:

☐ I was unable to execute service because:

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

My fee is $ __________.

**To be completed if service is by a sheriff or deputy sheriff:**

Date: ____________ SHERIFF OF ______________________ COUNTY, ARKANSAS

By: ________________________________________________
[signature of server]

____________________________________________________________
[printed name, title, and badge number]

**To be completed if service is by a person other than a sheriff or deputy sheriff:**

Date: 06/23/2026

By: ________________________________________________
[signature of server]

GILBERT DEL VALLE PROCESS SERVER
[printed name]

Address: BRANDYWINE PROCESS SERVERS, LLC
PO BOX 1360, WILMINGTON, DE 19899

Phone: 302-475-2600

Subscribed and sworn to before me this date: 06/23/2026

Notary Public ______________________

My Commission Expires: ______________________

KEVIN STEWART DUNN
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires OCTOBER 8, 2027

Additional information regarding service or attempted service:

__________________________________________________________

__________________________________________________________

**Form of Summons**

The Supreme Court of Arkansas has adopted the following form of summons for use in all cases in which personal service is pursuant to Rule 4(c), (f), and (h) of the Arkansas Rules of Civil Procedure. The form incorporates a proof of service to be made by a sheriff, deputy sheriff, or other person, as appropriate, in accordance with Rule 4(g).

The form may be modified as needed in special circumstances, and additional notices, if required, should be inserted as appropriate. Examples include the notices required by statute in unlawful-detainer and replevin actions, *see* Ark. Code Ann. §§ 18-60-307(a) and 18-60-808(a), and the notice of the consent jurisdiction of a state district court that must be included pursuant to Ark. Sup. Ct. Admin. Order No. 18(6)(d)(1).

This form is not for use in cases of constructive service pursuant to Rule 4(g)(3). The adoption of this form is in compliance with Rule 4(b) and does not modify or amend any part of that rule.

Effective July 1, 2012
Corrected August 14, 2012
Revised Effective January 1, 2019

**Case Title:** STATE OF ARKANSAS EX REL ET AL V SNAP INC

**Case Number:** 54CV-26-251

**Type:** SUMMONS - FILER PREPARED

So Ordered

Tamekia L. Franklin, Phillips Circuit Clerk

ELECTRONICALLY FILED
Phillips County Circuit Court
Tamekia L. Franklin, Circuit Clerk
2026-Jul-21 10:46:32
54CV-26-251
C01D01 : 2 Pages

**IN THE CIRCUIT COURT OF PHILLIPS COUNTY, ARKANSAS**
**CIVIL DIVISION**

**STATE OF ARKANSAS, *ex rel.*** **PLAINTIFF**
**TIM GRIFFIN, ATTORNEY GENERAL**

**v.** **No. 54CV-26-251**

**SNAP INC.** **DEFENDANT**

**ENTRY OF APPEARANCE AND REQUEST FOR NOTICE**

Peter Shults enters his appearance as counsel of record for defendant, Snap Inc., and requests that copies of all orders, notices, pleadings, and other papers in this case be served on him by email.[1]

DATED: July 21, 2026.

SHULTS LAW FIRM LLP
200 West Capitol Avenue, Suite 1600
Little Rock, AR 72201-3621
(501) 375-2301

By: */s/ Peter Shults*
Peter Shults
Ark. Bar No. 2019021
pshults@shultslaw.com

*Attorney for Defendant Snap Inc.*

[1] In filing this Entry of Appearance, Snap Inc. does not waive any right, defense, affirmative defense, or objection, including any challenges to venue and/or the exercise of personal jurisdiction.

## CERTIFICATE OF SERVICE

I certify that I filed the foregoing with the Clerk of the Phillips County Circuit Court using the electronic filing system, which shall send notification to all counsel of record.

/s/ *Peter Shults*
Peter Shults

ELECTRONICALLY FILED
Phillips County Circuit Court
Tamekia L. Franklin, Circuit Clerk
2026-Jul-21 10:47:41
54CV-26-251
C01D01 : 2 Pages

**IN THE CIRCUIT COURT OF PHILLIPS COUNTY, ARKANSAS**
**CIVIL DIVISION**

**STATE OF ARKANSAS, *ex rel.*** **PLAINTIFF**
**TIM GRIFFIN, ATTORNEY GENERAL**

**v.** **No. 54CV-26-251**

**SNAP INC.** **DEFENDANT**

**ENTRY OF APPEARANCE AND REQUEST FOR NOTICE**

Steven Shults enters his appearance as counsel of record for defendant, Snap Inc., and requests that copies of all orders, notices, pleadings, and other papers in this case be served on him by email.[1]

DATED: July 21, 2026.

SHULTS LAW FIRM LLP
200 West Capitol Avenue, Suite 1600
Little Rock, AR 72201-3621
(501) 375-2301

By: */s/ Steven Shults*
Steven Shults
Ark. Bar No. 78139
sshults@shultslaw.com

*Attorney for Defendant Snap Inc.*

[1] In filing this Entry of Appearance, Snap Inc. does not waive any right, defense, affirmative defense, or objection, including any challenges to venue and/or the exercise of personal jurisdiction.

**CERTIFICATE OF SERVICE**

I certify that I filed the foregoing with the Clerk of the Phillips County Circuit Court using the electronic filing system, which shall send notification to all counsel of record.

/s/ *Steven Shults*
Steven Shults